# IN THE SUPREME COURT OF TEXAS

════════════

No. 16-0244

════════════

ALAMO HEIGHTS INDEPENDENT SCHOOL DISTRICT, PETITIONER

v.

CATHERINE CLARK, RESPONDENT

════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS
════════════════════════════════════

JUSTICE GUZMAN delivered the opinion of the Court, joined by CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE DEVINE, and JUSTICE BROWN.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE LEHRMANN joined.

JUSTICE BLACKLOCK did not participate in the decision.

Workplace discrimination and harassment cases are some of the most sensitive and difficult to resolve. The conduct complained about in these types of cases is often so offensive that "it is easy to understand that a sense of decency initially inclines one to want to grant relief."[1] But anti-discrimination laws target "discrimination in the workplace, not morality or vulgarity."[2] An employer's liability is determined by the statute the Legislature enacted, not well-meaning judges. "The text is the law, and it is the text that must be observed."[3]

---

[1] *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 519 (6th Cir. 2001) (Guy, J., concurring in part and dissenting in part).

[2] *Id.*

[3] ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 22 (1997).

This discrimination and retaliation suit involves allegations of same-sex harassment and bullying by female coaches in the girls athletic department at a San Antonio middle school. The ultimate issue on appeal—the school district's immunity from suit—is subsumed in two predicate evidentiary matters concerning the governmental-immunity waiver in the Texas Commission on Human Rights Act (TCHRA). The TCHRA waives immunity from suit only for statutory violations, which means the trial court lacks subject-matter jurisdiction over the dispute absent some evidence the school district violated the TCHRA.[4] By intertwining the TCHRA's immunity waiver with the merits of a statutory claim, the Legislature ensures public funds are not expended defending claims lacking sufficient evidence to allow reasonable jurors to find the governmental entity liable. The main issues in this case are (1) whether the evidence raises an inference of gender-motivated discrimination and (2) whether the complainant must produce evidence to support her retaliation claim when no presumption of unlawful retaliation exists under the *McDonnell Douglas* burden-shifting framework. The latter inquiry is a question of first impression for the Court.

Sexual harassment is a form of sex-based discrimination and, as such, requires proof that the alleged mistreatment was "because of" the employee's gender. Anti-discrimination laws—in their current incarnation—do not guarantee a pleasant working environment devoid of profanity, off-color jokes, teasing, or even bullying. In this case, the record—viewed as favorably as the legal-sufficiency standard allows—bears no evidence that the inappropriate conduct alleged here was gender motivated.

---

[4] *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635-37 (Tex. 2012) ("[T]he Labor Code waives immunity from suit only when the plaintiff actually states a claim for conduct that would violate the TCHRA.").

A retaliation claim is related to, but distinct from, a discrimination claim, and one may be viable even when the other is not. Unlike a discrimination claim, a retaliation claim focuses on the employer's response to an employee's protected activity, such as making a discrimination complaint. The TCHRA's prohibition against retaliation does not protect employees from all ostracism, discipline, or even termination following a discrimination complaint. Rather, a remedy exists only when the evidence establishes that a materially adverse employment action resulted from the employee's protected activities.

Because retaliatory intent is rarely overt, the tripartite *McDonnell Douglas* burden-shifting framework provides a mechanism to support a retaliation claim with circumstantial evidence.[5] In this case, the parties dispute which facets of the burden-shifting framework constitute jurisdictional facts for purposes of the TCHRA's immunity waiver. The court of appeals limited the jurisdictional inquiry to the first step—the prima-facie-case element—even though the jurisdictional evidence neutralized the presumption it provides. This was error. Consistent with our analysis in *Mission Consolidated Independent School District v. Garcia*,[6] we hold that when jurisdictional evidence negates the prima facie case or, as in this case, rebuts the presumption it affords, some evidence raising a fact issue on retaliatory intent is required to survive a jurisdictional plea. Such evidence is lacking here.

We reverse the court of appeals' judgment and render judgment dismissing the employee's TCHRA claims.

---

[5] The U.S. Supreme Court established a burden-shifting evidentiary framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for circumstantial-evidence cases brought under Title VII of the Civil Rights Act of 1964. We consistently look to federal law to inform our construction and application of the TCHRA because one of its purposes is to "provide for the execution of the policies of Title VII." *Garcia*, 372 S.W.3d at 633-34 (quoting TEX. LAB. CODE § 21.001(1)).

[6] 372 S.W.3d at 642.

3

## I.    Background

### A.    The 2007–08 school year

In the summer of 2007, Alamo Heights Independent School District (Alamo Heights) hired Catherine Clark as a coach and physical education teacher in the girls athletic department at Alamo Heights Junior School.  Clark's tenure at the school got off to a seemingly successful start.  In a mid-year "Observation Summary," the middle school principal, Stephanie Kershner, gave Clark the highest possible score of "exceeds" in a subset of evaluative criteria.[7]  A few months later, in March 2008, Principal Kershner completed Clark's "Summative Annual Appraisal," carrying forward her "exceeds" ratings from the observation review.  In categories that had not previously been evaluated, Kershner gave Clark an "exceeds" rating for "professional development," and the next lower rating of "proficient" for "professional communication," "compliance with policies, operating procedures, and requirements," and "improvement of academic performance of all students."

As part of the summative appraisal conference, Principal Kershner addressed two particular matters of concern with Clark:  (1) co-worker reports that Clark was bringing her young children to school during instructional hours, which she acknowledged, and (2) a student's report that Clark and Ann Monterrubio, another newly hired female coach in the girls athletic department, were not "getting along."  Kershner directed Clark not to bring her children to work in the future, noting constant supervision was required due to their age.  Kershner further recommended the two coaches meet with the school counselor, to which Clark assented, and advised Clark to report any

---

[7] The school's "Professional Development and Appraisal System" includes eight overarching domains of assessment with a variety of individually graded metrics within each one.  Clark's mid-year evaluation covered only half the available domains.

4

problems.  In Clark's written summative appraisal, Kershner identified "communicat[ion] with the girls athletic coordinator and administrators" as a professional skill that Clark needed to improve.

Two months later, around mid-May, an emotionally distraught Clark visited Principal Kershner's office to complain about Monterrubio's behavior.  Clark was unable to communicate effectively due to her highly charged emotional state, so Kershner secured a substitute teacher to cover Clark's afternoon classes and allowed her to leave work to collect herself and prepare a written report.

Without explanation, Clark missed the next two days of school, and on her return, she submitted a thirteen-page typed letter detailing a litany of complaints against Monterrubio, extending as far back as the start of the school year (the May 14 letter).  She reported that Monterrubio bullied and harassed her on a daily basis; she had reported the objectionable conduct to the girls athletic department coordinator, Michelle Boyer; and Boyer personally observed many bullying and harassing incidents but did nothing to stop Monterrubio.  Clark explained that she decided to file a formal complaint following a conversation among Clark, Monterrubio, and Boyer during which Clark complained to Boyer about Monterrubio's behavior, such as interrupting her, criticizing her parenting, being disrespectful to students, not doing what she is supposed to be doing, and talking to other people about topics that bothered Clark.  Clark "had finally had enough" when Monterrubio stated that Monterrubio goes to the bathroom to talk on the phone to friends and that Boyer "probably thinks she's just taking a great big sh--."  Clark further explained she was "just now reporting this" because she feared retaliation and had expected Boyer and the school counselor to stop Monterrubio's bullying.

Among the more than four dozen incidents Clark catalogued, a handful that occurred months apart during the school year involved comments Monterrubio allegedly made about female

5

body parts, including Clark's breasts and buttocks. Clark also complained that Monterrubio frequently used vulgar language, often with sexual connotations, that was sometimes directed at her. According to Clark:

- Early in the school year, Monterrubio said, "Wow, Coach Clark, I think your boobs are going to pop out of your shirt!", told Clark that her thong underwear and the "dimples" on her buttocks were visible when she wore certain pants, and "talk[ed] about" her bottom and breasts throughout that week.

- Several weeks later, Monterrubio told Clark the male coaches were betting that her breasts were fake and that Monterrubio had agreed with that assessment.

- After Monterrubio received a candle Clark brought to the coaches' holiday gift exchange, Monterrubio stated "she was going to make love next to the candle when it was lit up in her apartment."

- At the end of January, Monterrubio warned Clark to step back from a pizza box to avoid getting pizza sauce on her "enormous" breasts.

- Near the end of the school year, Monterrubio reportedly made a remark about Clark needing to close her legs when a student mentioned smelling the shrimp Clark was eating for lunch.

In a different version of the letter she submitted to the Equal Employment Opportunity Commission (EEOC) five months later, she added:[8]

- At the new-teacher orientation in August, Monterrubio repeatedly questioned whether an assistant principal's breasts were real to the point that Clark thought it might be dangerous to have such a person in the girls locker room.

- Regarding the above-mentioned candle incident, Monterrubio reportedly also said, "I will think of you next time I am f---ing."

- After returning from spring break, Monterrubio once commented on "how tan [Clark's] chest was."

---

[8] The record bears two versions of the May 14 letter—a signed version Clark gave Kershner and an unsigned version Clark attached to her EEOC complaint and described as being "similar" to the one she submitted to Kershner. The unsigned version contains additional allegations and numerous details that deviate in material respects from the signed version. Except as otherwise indicated, for purposes of this appeal, we consider the more expansive version of the letter.

6

- Though Monterrubio knew Clark was married, she suggested Clark and a male coach would make a good couple and should "hook up." And "knowing it would upset" Clark, Monterrubio made similar statements twice more the same week.

Clark was also offended by Monterrubio discussing her own sex life, such as telling all the coaches about a sexual escapade involving three men in three nights, displaying a photo of her boyfriend's genitals, and looking at a picture of a naked man on the beach. Starting around Christmas and extending through February, Monterrubio had also forwarded a series of ten emails to various groups of people, including Clark, and some of the messages contained mildly profane or vulgar holiday-inspired cartoons or jokes, among others.

Clark recounted she was particularly upset by Monterrubio's and Boyer's conduct at the faculty Christmas party. According to Clark, Monterrubio and Boyer purchased "indecent ornament[s]" for themselves and Clark to take to the holiday gift exchange, but Clark refused to take one of the ornaments to the party because she feared getting into trouble. Clark also complained that, at the party, Monterrubio and Boyer became intoxicated and engaged in inappropriate activities, such as clanging beer bottles during the prayer, "extremely dirty dancing," and "grabbing their private areas of their bodies for photographs next to the Christmas tree." Though not mentioned in either version of the May 14 letter, Clark later testified in her deposition that Monterrubio and Boyer similarly grabbed Clark's behind once during a group photo.

The multitude of other incidents Clark described in the letter are not remotely sexual in nature. Clark complained Monterrubio brushed shoulders with her a couple of times while they were passing in a doorway and bumped her once with a box. Clark's concerns mostly involved Monterrubio doing things like swearing, snapping at her, making rude comments to Clark's daughter when she brought the child to work, reading her papers, instructing her to use a different

7

printer, teasing her for getting a spray tan, criticizing her teaching and parenting skills, and discussing atheism and abortion with a roomful of coaches.

Clark detailed not only personal mistreatment but also many instances of inappropriate behavior toward students and parents. Clark said the other coaches, both male and female, heard Monterrubio's dirty jokes and sexual comments, and Monterrubio mistreated them as well, talking about them behind their backs, making fun of them, and insulting them "on a daily basis."

Though Clark stated Monterrubio regularly bullied, harassed, embarrassed, and offended her, she never alleged Monterrubio did so because she is a woman. To the contrary, Clark discussed other motives for this behavior unrelated to gender. Monterrubio told Clark several times that Clark "should just be a stay-at-home Alamo Heights Mom," while "constantly" insulting those mothers as being "smug, wealthy and snotty." Clark complained that the presence of other employees' children at school did not seem to be a problem, but Monterrubio did not like children in general and Clark's in particular because they annoyed her when she brought them into work. And, Monterrubio frequently criticized Clark's parenting style. Clark later elaborated that Monterrubio did not like her, calling Clark a "snob" who acted "high and mighty" and whose children were "Trust-Fund babies." Clark believed Monterrubio was "jealous" of her and intentionally did things "to upset her" because she "enjoy[ed] getting a rise" from her.

Principal Kershner did not report Clark's complaint to district officials. Rather, Kershner investigated Clark's complaint on her own and issued a written response on May 23. "I currently have no evidence supporting the details of your experiences and or perceptions," Kershner wrote. She urged Clark to be proactive in communicating complaints in a timely manner and, once again, counseled her about bringing her children to work during instructional hours.

8

**B.      The 2008–09 school year**

As the new school year began, Kershner kept a close eye on the girls athletic department. In an effort to facilitate communication and resolve lingering tensions within the department, Kershner implemented weekly meetings with herself, Clark, Monterrubio, Boyer, and the athletic director. On occasion, Clark would make vague reference to additional upsetting incidents but did not discuss the particulars because her May complaint had been "swept under the rug." In addition to the departmental meetings, Kershner and the athletic director had separate meetings with Clark about her job performance, reports that she secretly recorded conversations with her co-workers, and her continuing to bring her children to work.

Despite these ongoing meetings, concerns persisted. Principal Kershner consulted with Dr. Dana Bashara, the school district's human resources director, about a path forward. Bashara and Kershner decided both Monterrubio and Clark should be placed on an employee growth plan. Kershner and Bashara met on October 9, 2008, for the express purpose of preparing Clark's growth plan. The plan, which was presented to Clark on October 29, required weekly meetings with Boyer, "in an effort to promote professional communication" and stated Boyer would submit meeting notes to Kershner to demonstrate Clark's improved communication. At the same time, Kershner placed Monterrubio on a similar growth plan.

Meanwhile, in mid-October, after the growth-plan decision was made but before its implementation, Clark filed a charge of discrimination with the EEOC, alleging Monterrubio and Boyer sexually harassed her and, after she complained, the school district and her supervisors retaliated against her by (1) singling her out for workplace restrictions, (2) ostracizing her, and (3) being unjustly critical of her work performance. Clark also claimed Boyer was aware of

9

Monterrubio's comments about her body, took no action to stop Monterrubio, and instead "began to make sexual comments" herself.

The record contains no additional details regarding any "sexual comments" to her by Boyer, but Clark alleges Monterrubio made several sex-related comments at some unspecified point during the 2008–09 school year:

- Monterrubio continued to make unspecified comments about Clark's breasts and buttocks and told Clark that she used Clark's razor to shave her genitals.

- Monterrubio and Boyer discussed fellatio while eating eggrolls.

- Monterrubio called across the room to Boyer, in Clark's presence, "I wonder if Coach Clark swallows."

- Monterrubio told a story about having sex after barhopping and made jokes about Viagra.

In January and February 2009, Clark submitted three letters to Kershner detailing more than forty additional complaints against Monterrubio, Boyer, other coaches, and Kershner herself. With the exception of saying that Monterrubio had once stared at her bottom, none of those complaints related to sex in any way but instead were claimed acts of retaliation for asserting a sexual-harassment complaint. Clark was upset about various perceived slights by the other coaches, such as hidden keys, thrown-away printouts, being excluded from breakfast tacos, loud music in the office, cold shoulders, dirty looks, and being snapped at and locked out of the gym. According to Clark, Kershner was rude to her in meetings and unfairly reprimanded her for continuing to bring her children to work.

10

Shortly after submitting the last of these three complaints, Clark requested and was granted leave under the Family and Medical Leave Act (FMLA).[9]  Meanwhile, Kershner investigated Clark's complaints and, when Clark returned, issued a written response concluding (1) no evidence of retaliation existed and (2) Clark was responsible for any difficulties with her co-workers. Kershner reminded Clark, as per her growth plan, she must make efforts to improve working relationships with her colleagues or she risked termination.

By all accounts, the department ran smoothly during Clark's leave, but almost immediately upon her return, discord again broke out.  Within a week, Clark filed a formal grievance, accusing Monterrubio of pushing Clark from behind during class.  She requested, as her grievance remedy, that either she or Monterrubio be transferred.

In addition to the pushing complaint, Clark stated in her grievance that she was afraid of Monterrubio because of her daily bullying.  When Kershner inquired about this comment, Clark responded with nearly thirty more allegations against Monterrubio and to some extent Boyer, similar to those reported in January and February, such as snapping, profanity, teasing, door slamming, shoulder bumping, and her car antennae being removed.  Clark also accused Monterrubio of chasing her in her car.  She made sweeping allegations about Monterrubio's daily mistreatment of practically everyone, including "students, parents, and teachers," and that she "enjoys teasing students and staff and causing trouble."

After investigating Clark's pushing grievance and related new allegations, Kershner determined the grievance had no merit but nevertheless transferred Monterrubio in hopes of restoring order to the department.  This effort failed.  Even with Monterrubio gone, Clark's

---

[9] *See* 29 U.S.C. §§ 2601-2654.

11

performance continued to suffer, her conflicts with co-workers intensified, and she continued to complain of perceived slights. Clark also admitted to lying about an incident involving a violation of state standardized-testing protocols.

Because of these issues, Principal Kershner recommended to the superintendent that Clark be placed on paid administrative leave while the district investigated and evaluated the situation. Kershner brought in Bashara to run the investigation, and Bashara discovered and verified many additional performance issues. For example, the substitute teacher covering Clark's classes during her FMLA leave reported that Clark had not been following lesson plans or maintaining daily grades, as required by campus policy. The other coaches reported Clark had been neglecting her coaching duties, such as by being on her office computer during practice, and had twice again brought her daughter to school during instructional time.

Citing these new issues, along with Clark's role in disrupting the department, the standardized-testing incident, and failure to comply with her growth plan, Principal Kershner gave Clark a markedly poorer summative evaluation and recommended to the superintendent that Clark be terminated for cause.

In July 2009, the Alamo Heights School Board issued a Notice of Proposed termination that included nineteen specific instances of conduct supporting good cause for termination. Although Clark was entitled to an evidentiary due process hearing before an independent hearing examiner, she never contested the grounds for termination or requested a hearing, and she was fired in August 2009.

## C.     Lawsuit

Clark sued Alamo Heights, asserting sexual-harassment and retaliation claims under the TCHRA.[10]  After discovery, Alamo Heights filed a plea to the jurisdiction, arguing the TCHRA's governmental-immunity waiver does not apply because Clark has no evidence of a statutory violation.    Alamo Heights attached proof of Clark's unsatisfactory job performance, noncompliance with the growth plan, and policy violations as legitimate nondiscriminatory reasons for her dismissal.  In addition to other alleged evidentiary deficiencies, the school district argued in relevant part that Clark had (1) no evidence the objectionable behavior was gender-based, which is required to state a prima facie case of sexual harassment, and (2) no evidence of a causal link between statutorily protected anti-discrimination activities and a materially adverse employment action.

The trial court denied the plea, and on interlocutory appeal, the court of appeals affirmed, holding Clark had established a prima facie case of sexual harassment and retaliation sufficient to invoke the TCHRA's immunity waiver and establish subject-matter jurisdiction over Clark's claims.[11]

With respect to Clark's sexual-harassment claim, the appellate court held, in pertinent part, that the record contains some evidence the alleged harassment was gender motivated.  The court stated that "the bulk of Monterrubio's comments relate to the fact that Clark is female," for example "a significant number of comments to Clark about Clark's female anatomy, i.e., her breasts, as well as her buttocks."[12]

---

[10] TEX. LAB. CODE §§ 21.001-.556.

[11] ___ S.W.3d ___, 2015 WL 6163252, at *6-7 (Tex. App.—San Antonio 2015).

[12] *Id*. at *5.

13

With respect to the retaliation claim, the court declined to consider whether Clark produced any evidence that the stated reasons for her termination were merely pretextual, holding that, in circumstantial-evidence cases, the jurisdictional inquiry is limited to the prima-facie-case element of the *McDonnell Douglas* framework and does not include an evaluation of pretext evidence.[13]

The issue on appeal is whether the evidence raises a fact issue sufficient to invoke the TCHRA's immunity waiver as to either of Clark's claims. Subsumed within that overarching inquiry is (1) whether there is more than a scintilla of evidence that Clark was harassed "because of" her gender and (2) whether the jurisdictional facts in a TCHRA circumstantial-evidence case are limited to the prima-facie-case element even if the presumption it raises has been rebutted by evidence attached to the jurisdictional plea. We granted review to resolve a jurisprudential inconsistency regarding which elements of a circumstantial-evidence TCHRA case constitute the jurisdictional facts.[14]

---

[13] *Id.* at *6 ("[B]ecause we are reviewing the trial court's denial of AHISD's plea to the jurisdiction, we are limited to reviewing whether Clark has shown a prima facie case for her retaliation claim, and thus do not examine whether Clark has shown pretext.").

[14] *Compare, e.g., id., and Tex. Dep't of State Health Servs. v. Rockwood*, 468 S.W.3d 147, 154 (Tex. App.—San Antonio 2015, no pet.), *and KIPP, Inc. v. Whitehead*, 446 S.W.3d 99, 112-13 (Tex. App.—Houston [1st Dist.] 2014, pet. denied), *with Harris Cty. Hosp. Dist. v. Parker*, 484 S.W.3d 182, 199-200 (Tex. App.—Houston [14th Dist.] 2015, no pet.), *and Tex. State Office of Admin. Hearings v. Birch*, No. 04-12-00681-CV, 2013 WL 3874473, at *24 (Tex. App.—San Antonio July 24, 2013, pet. denied) (mem. op.). *See also* Act of May 29, 1987, 70th Leg., R.S., ch. 1106, § 1, sec. 22.001, 1987 Tex. Gen. Laws 3804, 3804 (amended 2003, 2017) (current version at Tex. Gov't Code § 22.001).

## II. Discussion

### A. Standard of Review

Governmental units, including school districts, are immune from suit unless the state consents.[15] The TCHRA waives immunity, but only when the plaintiff states a claim for conduct that actually violates the statute.[16]

Immunity from suit may be asserted through a plea to the jurisdiction or other procedural vehicle, such as a motion for summary judgment.[17] A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both. When a jurisdictional plea challenges the pleadings, we determine if the plaintiff has alleged facts affirmatively demonstrating subject-matter jurisdiction.[18] If, however, the plea challenges the existence of jurisdictional facts, we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim.[19]

Here, the school district's jurisdictional plea challenged the existence of jurisdictional facts with supporting evidence. In such cases, the standard of review mirrors that of a traditional summary judgment:[20] "[I]f the plaintiffs' factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal plaintiffs

---

[15] *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004).

[16] *Garcia*, 372 S.W.3d at 637 (citing TEX. LAB. CODE § 21.254).

[17] *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000).

[18] *Miranda*, 133 S.W.3d at 227.

[19] *Garcia*, 372 S.W.3d at 635; *Bland*, 34 S.W.3d at 555.

[20] *Miranda*, 133 S.W.3d at 225-26.

must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction."[21] In determining whether a material fact issue exists, we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor.[22] In doing so, however, we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not.[23]

### B.      Same-Sex Sexual Harassment

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating in the terms, conditions, and privileges of employment "because of . . . sex."[24] In *Meritor Savings Bank, FSB v. Vinson*, the United States Supreme Court held that Title VII's prohibition of sex discrimination in employment encompasses "the entire spectrum of disparate treatment of men and women in employment," including sexual harassment.[25] The Texas Legislature modeled the TCHRA on Title VII, and we have expressly recognized that the TCHRA prohibits sexual harassment.[26] To prove sexual harassment based on a hostile work environment, the plaintiff must show (1) she was subjected to unwelcome sexual harassment, (2) she was harassed because of her

---

[21] *Id.* at 221.

[22] *Id*. at 228.

[23] *See City of Keller v. Wilson*, 168 S.W.3d 802, 811-12, 822-23, 827 (Tex. 2005).

[24] 42 U.S.C. § 2000e-2(a)(1). In this opinion, we use the terms "sex" and "gender" interchangeably, as does the Supreme Court. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

[25] 477 U.S. 57, 64 (1986) (internal quotation marks omitted).

[26] *See* TEX. LAB. CODE §§ 21.001, .051; *B.C. v. Steak N Shake Operations, Inc.*, 512 S.W.3d 276, 279 (Tex. 2017).

sex, (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile work environment, and (4) some basis for holding the employer liable.[27]

The dispositive issue on appeal is whether Clark raised a fact issue on the second element, that the offending conduct was based on her gender. Viewing the record in the light most favorable to Clark, her working environment was undoubtedly harassing. But based on Clark's own version of events, which provides vital context that cannot be ignored in a legal-sufficiency review, a jury could not reasonably conclude the alleged harassment was motivated by her gender.

### 1. Legal Standard for Same-Sex Harassment

In *Oncale v. Sundowner Offshore Services, Inc.*, the U.S. Supreme Court held Title VII's protection against workplace discrimination "because of . . . sex" applies to harassment between members of the same gender.[28] Title VII is not "a general civility code" that protects against "all verbal or physical harassment in the workplace," even when "the words used have sexual content or connotations."[29] The critical issue is whether the conduct at issue constitutes discrimination because of the victim's gender.[30]

Though same-sex and opposite-sex harassment cases are rooted in the same statutory prohibition, evidentiary issues naturally differ.[31] How to prove the harasser's conduct is motivated by gender is more complicated in same-sex harassment cases because the inferences that arise from words and conduct are not necessarily the same when the harasser and victim are the same

---

[27] *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017).

[28] 523 U.S. 75, 79 (1998) (quoting Title VII).

[29] *Id.* at 80.

[30] *Id.*

[31] In this case, we express no opinion regarding how to resolve a similar case involving a harasser and victim of different genders.

gender.[32]  As the Supreme Court made clear in *Oncale*, the inference of discrimination is "easy to draw" in most opposite-sex cases "because the challenged conduct typically involves explicit or implicit proposals of sexual activity" and thus "it is reasonable to assume those proposals would not have been made to someone of the same sex."[33]  That inference does not arise automatically in same-sex cases.  However, "[t]he same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual."[34]

In addition to motivation by sexual desire, the *Oncale* Court identified two other methods of proving gender-based animus in same-sex cases—evidence of general hostility to a particular gender in the workplace and direct comparative evidence of the harasser's treatment of both sexes.  The Court explained:

> [H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex.  A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.  A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.[35]

---

[32] *See Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002) (the because-of-sex element "of a hostile-environment claim presents a plaintiff with serious obstacles where, as here, the perpetrators and plaintiff are of the same sex"); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir. 2001) ("The question of how to prove that same-sex harassment is because of sex is not an easy one to answer."); *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 260 (4th Cir. 2001) ("[T]he causation element poses an especially formidable obstacle in same-sex harassment cases.").

[33] 523 U.S. at 80.

[34] *Id.*

[35] *Id.* at 80-81.

This discussion of evidentiary methods does not purport to be exclusive, as courts have recognized.[36] But, "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'"[37] Clark has not raised a fact issue that the harassment she alleges was based on her gender, under these three methods or any other.

### 2. No Evidence of Sexual-Desire Motivation

Clark asserts a factual dispute exists regarding motivation by sexual desire under *Oncale*'s first evidentiary route. As a predicate matter, the parties disagree about whether "credible evidence" that the harasser is homosexual is required.[38] Some courts have treated *Oncale*'s "credible evidence" of homosexuality language as imposing a mandatory requirement of such evidence in every first-route evidentiary case.[39] Other courts have determined this route requires only proof of motivation by sexual desire, which may be shown by any relevant evidence, including—but not limited to—sexual propositions combined with "credible evidence" that the harasser is homosexual.[40] We need not determine which approach is correct because, under either, the evidence is lacking.

---

[36] *See, e.g., EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 455-56 (5th Cir. 2013).

[37] 523 U.S. at 81 (emphasis and alterations in original).

[38] *Id.* at 80.

[39] *See, e.g., Love v. Motiva Enters. LLC*, 349 F. App'x 900, 903-04 (5th Cir. 2009); *McCown v. St. John's Health Sys., Inc.*, 349 F.3d 540, 543 (8th Cir. 2003); *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002).

[40] *See, e.g., Dick v. Phone Directories Co.*, 397 F.3d 1256, 1264-65 (10th Cir. 2005); *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1069 (8th Cir. 2005); *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1010 (7th Cir. 1999).

To begin with, Clark has never alleged—in her written complaints, EEOC charge, or lawsuit—that either Monterrubio or Boyer are homosexual. Nevertheless, we have reviewed the record for such evidence. *Oncale* requires evidence of homosexuality to be "credible."[41] The Fifth Circuit has discussed two types of such credible evidence: (1) "evidence suggesting that the harasser intended to have some kind of sexual contact with the plaintiff rather than merely to humiliate [her] for reasons unrelated to sexual interest" and (2) "proof that the alleged harasser made same-sex sexual advances to others, especially to other employees."[42] Clark has never claimed she was sexually propositioned, and there is no evidence from which an invitation to engage in sexual activity can be reasonably inferred. No evidence exists of same-sex sexual advances from either Monterrubio or Boyer towards anyone. The record references some rumors that one or both of them are possibly lesbians or bisexual, but such gossip and speculation does not constitute credible evidence.[43] Neither is Clark's subjective belief that Monterrubio looked at her in a "creepy" manner and was "hitting on her."[44] Thus, Clark cannot raise a fact issue under *Oncale*'s first route by showing sexual propositions from a homosexual harasser.

---

[41] 523 U.S. at 80.

[42] *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 480 (5th Cir. 2002).

[43] *See Stancombe v. New Process Steel LP*, 652 F. App'x 729, 733 (11th Cir. 2016) ("Stancombe's apparent belief that Woodfin was gay and workplace rumors to that effect do not qualify as 'credible evidence.'"); *Reissner v. Rochester Gas & Elec. Corp.*, No. 02-CV-6353-CJS, 2004 WL 941645, at *9 (W.D.N.Y. Apr. 22, 2004) (office gossip is not credible evidence of homosexuality).

[44] *See Stancombe*, 652 F. App'x at 733; *Wasek v. Arrow Energy Servs.*, No. 09-11350-BC, 2010 WL 3904697, at *6 (E.D. Mich. Sept. 29, 2010) ("Plaintiff's belief that Ottobre was 'possibly bi-sexual' does not constitute 'credible evidence' that his harasser was gay."); *English v. Pohanka of Chantilly, Inc.*, 190 F. Supp. 2d 833, 846 (E.D. Va. 2002) (holding plaintiff cannot rely on his subjective belief that harasser was gay); *see also Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996) ("[I]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed."); *Tex. Div.-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994) ("Carrozza's subjective beliefs are no more than conclusions and are not competent summary judgment evidence.").

The evidence does not otherwise show a fact issue regarding motivation based on sexual attraction or desire. Before we analyze any particular evidence, it is imperative to keep in mind the entire context. The *Oncale* Court admonished tribunals to always consider the context when assessing whether harassing conduct is severe and pervasive,[45] and attention to context is equally important in determining whether conduct is gender motivated.[46] "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."[47]

A careful evaluation of Clark's complaints reveals no evidence of harassment motivated by sexual desire. In a series of mostly written complaints, Clark thoroughly detailed a list of accusations, mostly against Monterrubio, but also a few against Boyer and eventually many others in the department. The gist of Clark's complaints was that Monterrubio was rude, crude, and regularly unprofessional, not just to Clark, but in Monterrubio's interactions with colleagues, parents, and students. Male and female alike. Both in the workplace and at work-related events. But mostly, the complaints chronicle events depicting Monterrubio as a bully who simply did not like Clark, was vindictive, and exploited every opportunity to target her and make her feel uncomfortable.

---

[45] 523 U.S. at 81-82.

[46] *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 261 (4th Cir. 2001) ("The causation element must be analyzed in its proper context."); *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1010 (7th Cir. 1999) ("Whether the sexual content of the harassment is indicative of sex discrimination must therefore be examined with attention to the context in which the harassment occurs."); *cf. City of Keller v. Wilson*, 168 S.W.3d 802, 811-12 (Tex. 2005) (emphasizing the importance of context evidence when reviewing legal sufficiency).

[47] *Oncale*, 523 U.S. at 81-82.

Among the more than one hundred incidents Clark cataloged in writing over two school years, only a handful involved specific comments Clark alleges Monterrubio made about female body parts, including Clark's buttocks, the size of her breasts, and whether they are real. Clark also complained that Monterrubio frequently used vulgar language with sexual connotations that was sometimes directed at Clark and periodically discussed Monterrubio's sexual encounters between herself and various men. Monterrubio shared a couple of nude photos of men and forwarded eight to ten emails, some of which contained mild profanity and off-color jokes, to Clark and several other people. Clark was particularly disturbed by Monterrubio's and Boyer's conduct at the faculty Christmas party, where they brought "indecent ornament[s]" for a faculty gift exchange, became intoxicated, and grabbed their own "private areas" while "[f]ooling around" and engaging in "horseplay," and then similarly grabbed Clark's behind briefly during a group photo. The multitude of other incidents Clark described are not remotely sexual in nature, involving things such as being brushed up against while passing in a doorway, swearing, rudeness, teasing, criticizing her teaching and parenting skills, loud music, dirty looks, hiding her phone and keys, reading her papers, throwing away her printouts, being locked out of the gym and excluded from breakfast tacos, and discussing topics such as atheism and abortion, among many others.

Rather than sexual desire, the record is replete with evidence directly from Clark's complaints and deposition that Monterrubio and Boyer engaged in this behavior for other reasons. Monterrubio was jealous of Clark, viewed her as "snotty" and "high and mighty," thought she should quit her job to be a stay-at-home mom, did not like Clark's children or approve of her bringing them to school, was a bully who enjoyed getting a rise out of her, and along with her

22

friend Boyer, simply did not like Clark. None of those motives are based on gender.[48] Sexually tinged comments may be motivated by other reasons, such as personal animus, jealousy, or the desire to irritate or bully. We do not hold, as the dissent insinuates, that such motives justify a "steady stream of sexual harassment."[49] That puts the cart before the horse by assuming the conduct at issue is sexual harassment without examining the motives necessary to establish sexual harassment. Motives like personal animus or bullying do not satisfy the because-of-sex requirement, even if the comments are profane,[50] vulgar,[51] or have sexual overtones.[52] Myopic focus on select details of offending behavior ignores the reason for it, and the reason is what matters under the TCHRA.

Clark complained that Monterrubio harassed and bullied not only her but seemingly everyone else she encountered, including students, parents, and the other coaches. As Clark herself alleged, Monterrubio enjoyed being crass and profane and telling dirty jokes and stories to *all* the coaches, male and female, not just Clark. This treatment of co-workers of both genders provides

---

[48] *See McCown v. St. John's Health Sys., Inc.*, 349 F.3d 540, 543 (8th Cir. 2003) (finding no evidence of sexual-desire motivation, in part because the harasser "was just trying to 'irritate' [the plaintiff] because 'that's just how [the harasser] was"); *King v. Super Serv., Inc.*, 68 F. App'x 659, 663 (6th Cir. 2003) (finding no evidence harassers were motivated by sexual desire rather than "animus, power, or whatever it is that drives bullies to single out others for taunting and ridicule," even though they "directed crude and sexually suggestive language" toward plaintiff); *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002) (concluding no jury could find motivation by sexual attraction rather than a grudge); *Wasek*, 2010 WL 3904697, at *6-7 ("Ottobre believed harassing Plaintiff was funny, not sexually gratifying.... [T]he record indicates that Ottobre was a bully; a man who enjoyed mentally and physically tormenting weaker people around him.... It does not, however, indicate that Ottobre's enjoyment was sexual in nature or that he targeted Plaintiff because of his sex."); *English*, 190 F. Supp. 2d at 836 ("The conduct must be discrimination motivated by the victim's gender, not the harasser's desire to humiliate or tease the Plaintiff.").

[49] *Post* at 27-28.

[50] *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301 (11th Cir. 2007) ("Title VII does not prohibit profanity alone, however profane.").

[51] *See Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1068, 1069 (8th Cir. 2005) (noting a plaintiff must prove "she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior"); *McCown*, 349 F.3d at 543 ("[C]rude gender-specific vulgarity is not, by itself, probative of gender discrimination.").

[52] *See Oncale*, 523 U.S. at 80, 81.

23

crucial context that Monterrubio's motives were based on factors other than gender.[53]  In other words, Monterrubio offended everyone indiscriminately.  "It would be paradoxical to permit a plaintiff to prevail on a claim of discrimination based on indiscriminate conduct."[54]  Monterrubio may have directed more of her attention to Clark than other men and women at work, but there is no evidence she did so because Clark is a woman.

Clark claims that acts of "unwanted sexual touching" indicate sexual desire.  The record does not support this allegation.  The only touching allegation that could conceivably be interpreted as sexual is Monterrubio and Boyer grabbing her behind during a group photo.  Again, context is critical.  This is why, as Justice Scalia explained in *Oncale*, a coach smacking a football player's buttocks as he heads onto the field is not harassment whereas the same action towards the coach's secretary might be.[55]  Other courts analyzing same-sex harassment claims have similarly distinguished sexual horseplay from sexual discrimination[56] or concluded, based on the surrounding circumstances, that much more egregious instances of physical contact than Clark alleges did not show gender motivation, including grabbing the plaintiff's genitals, poking the

---

[53] *See Smith v. Hy-Vee, Inc.*, 622 F.3d 904, 908 (8th Cir. 2010); *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 261 (4th Cir. 2001); *Collins v. TRL, Inc.*, 263 F. Supp. 2d 913, 920 (M.D. Penn. 2003).

[54] *Baldwin*, 480 F.3d at 1301; *see also Lack*, 240 F.3d at 262 ("Bragg was just an indiscriminately vulgar and offensive supervisor, obnoxious to men and women alike."); *Jackson v. City of Killeen*, 654 F.2d 1181, 1186 (5th Cir. 1981) ("It scarce need be said that Title VII is not a shield against harsh treatment at the workplace; it protects only in instances of harshness disparately distributed.  The essence of the action is, of course, discrimination.").  The dissent points to some federal cases finding mistreatment of both male and female co-workers did not foreclose a finding of sexual harassment when women were treated disproportionately worse.  *Post* at 28-29.  No evidence of similar disparities in male/female treatment exists here, as will be explained in section II.B.4 *infra*.

[55] *Oncale*, 523 U.S at 81.

[56] *See Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 562 (7th Cir. 2016) ("Sexual horseplay differs from sex *discrimination*, and Title VII covers only discriminatory conduct." (emphasis in original) (internal quotation marks omitted)).

24

plaintiff's rectum, the harasser running her hands and body over the plaintiff's body, and the harasser grinding his genitals on the plaintiff.[57]

Here too, context informs the nature of the contact. Clark acknowledged Monterrubio and Boyer had been "[f]ooling around" and similarly touching each other as "horseplay" shortly before grabbing her behind during the photo. She confirmed she did not know their motivation in grabbing her, though she did not consider it "playing around because that's not the way I play." By her own account, the incident occurred only once, was in public, lasted only a few seconds, and was not accompanied by a sexual proposition.[58] In most circumstances, unwelcome touching of a co-worker's buttocks is inappropriate and may well violate the employer's internal policies and lead to disciplinary action.[59] Considered in the context of this event and Monterrubio's prior interactions with Clark, however, this isolated instance of intentional physical contact, though understandably upsetting, could not be reasonably interpreted as a sexually motivated touching.

The handful of other incidents of physical contact Clark alleges, such as bumping in a doorway, also cannot be reasonably interpreted as indicating sexual desire, individually or

---

[57] *See, e.g.*, *id*. at 560-62 (repeatedly grabbed and poked bottom, grabbed between the legs); *Smith*, 622 F.3d at 905, 907-08 (pushed plaintiff against wall for ten to fifteen seconds while rubbing her hands and body up against plaintiff to demonstrate how she would rape someone); *McCown v. St. John's Health Sys., Inc.*, 349 F.3d 540, 541-44 (8th Cir. 2003) (grabbed and kicked bottom, ground genitals against plaintiff in simulated intercourse, attempted to insert shovel handle in anus); *Linville v. Sears, Roebuck & Co.*, 335 F.3d 822, 823-84 (8th Cir. 2003) (repeatedly hit scrotum); *King v. Super Serv., Inc.*, 68 F. App'x 659, 660-61, 663-64 (6th Cir. 2003) (grabbing, punching, and kicking); *Wasek v. Arrow Energy Servs.*, No. 09-11350-BC, 2010 WL 3904697, at *2-3, 7 (E.D. Mich. Sept. 29, 2010) (repeated poking in buttocks with hands and tools); *Collins*, 263 F. Supp. 2d at 916, 919 (repeated crotch grabbing); *English v. Pohanka of Chantilly, Inc.*, 190 F. Supp. 2d 833, 837-38, 849 (E.D. Va. 2002) (hit behind, rubbed genitals against plaintiff).

[58] *See English*, 190 F. Supp. 2d at 845-46 (conduct including touching behind and rubbing genitals against plaintiff did not constitute evidence of sexual attraction because there was no direct sexual proposition and the conduct was public and designed to solicit laughter, indicating it was teasing and horseplay).

[59] *Cf. Oncale*, 523 U.S. at 81.

collectively. In fact, Clark characterized those incidents as bullying and retaliatory because Monterrubio was upset about Clark's complaints, which is distinct from gender motivation.[60]

Aside from physical contact, Clark claims that Monterrubio "commenting about [her] body . . . would be evidence . . . that she liked [her] body" and therefore was sexually attracted to her. We disagree. It takes more than a woman noticing and commenting on a feature of another woman's body—even in a complimentary way—to demonstrate sexual attraction.[61] And none of Monterrubio's body-related comments are, on their face, complimentary.

Clark emphasizes Monterrubio's purported statement that she would "think about" Clark during intercourse with her boyfriend while burning a candle Clark brought to the coaches' holiday gift exchange. But even then, Monterrubio did not say she wanted to have sex with Clark but with someone else. Though Clark does not mention it in her briefing, the dissent points to an incident Clark discusses in her deposition involving a cupcake. During a meeting in which Clark was complaining to Boyer about Monterrubio's profanity, Monterrubio repeatedly interrupted the meeting by coming in and out of the office. One of these interruptions involved Monterrubio "using her tongue to lick seductively the cupcake icing off of a cupcake." Considering these circumstances, which the dissent acknowledges but does not account for, and notwithstanding Clark's subjective view of its "seductive[ness]," Monterrubio's licking a cupcake cannot reasonably be equated with a genuine sexual proposition. Considered in isolation or in the context

---

[60] *See Swindle v. Jefferson Cty. Comm'n*, 593 F. App'x 919, 925-26 (11th Cir. 2014) (distinguishing conduct motivated by sex from conduct motivated by retaliation for complaining about sexual harassment).

[61] *See Wade v. Automation Pers. Servs.*, No. 1:12-cv-375, 2014 WL 11515694, at *1, 5 (E.D. Tenn. July 7, 2014) (comments about plaintiff's undergarments and breasts, including their size, did not indicate sexual desire because female harasser never propositioned plaintiff, described same-sex sexual activity, or indicated she found plaintiff attractive); *see also Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 261 (4th Cir. 2001) (sex-specific comments from male harasser to plaintiff, including about plaintiff's genitals, did not indicate gender motivation).

26

of Clark's other complaints, these comments do not indicate sexual attraction to Clark but, consistent with her other behavior, a desire to tease Clark and make her feel uncomfortable.[62]

Viewing all the evidence in context and as favorably to Clark as the reasonable inferences allow, no reasonable juror could find the behavior Clark complains of was motivated by sexual desire.

### 3. No Evidence of General Hostility to Women

Evidence that "a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace" can establish harassment because of gender under *Oncale*'s second evidentiary route.[63] This evidence focuses on hostility towards the harasser's own gender in the workplace. Though presumably uncommon, discriminatory animus might arise, for example, in a situation where a male doctor believes men should not be nurses or a female airline executive thinks piloting is a man's job.[64] Clark makes no argument under this evidentiary method—and for good reason given her allegations of Monterrubio's across-the-board mistreatment of male and female coaches.[65] None of the record evidence even hints that Monterrubio's behavior, with her mistreatment of men and women alike, evinces hostility to her own gender in the workplace. Thus, Clark has not raised a fact issue under *Oncale*'s second evidentiary route.

---

[62] *See Lord*, 839 F.3d at 560, 562 (four instances of male harasser touching plaintiff's buttocks and grabbing "between his legs" was not "so explicit or patently indicative of sexual arousal that a trier of fact could reasonably draw that conclusion").

[63] 523 U.S. at 80.

[64] *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir. 2001).

[65] *See Smith v. Hy-Vee, Inc.*, 622 F.3d 904, 908 (8th Cir. 2010) (rejecting second-route evidentiary theory because evidence showed harasser "treated all employees, both male and female, in the same vulgar and inappropriate way").

#### 4. No Direct Comparative Evidence of Discrimination

*Oncale*'s third method of proving sex-based discrimination in same-sex harassment cases is offering "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."[66] This method allows a same-sex harassment plaintiff to demonstrate gender motivation based on either sex-neutral conduct or conduct with sexual connotations.

Following oral argument, Clark asserted, for the first time in this case, that a fact issue exists under this theory. Thus, we must examine the record for evidence of how Monterrubio treated her co-workers. We find the record is sparse and inadequate to raise a fact issue. Generally, Clark alleges the following about Monterrubio:

- "Not only did [Monterrubio] talk trash about me, but she did it about everyone behind their backs. She constantly complained about Coach Moore, Coach Gonzales, Coach McCallister, and all the male coaches. She made fun of their professional and private lives. She griped about the way they worked and made digs about their character on a daily basis."

- Monterrubio "is extremely hostile toward her co-workers on a daily basis."

- "She makes fun of not just me, but students, parents, and teachers on a daily basis. She badmouths others and has no concern for discretion. . . . She is known to habitually snap at me, other coaches, students, and parents. She enjoys teasing students and staff and causing trouble. Ann shouts at students and fellow coaches, including me."

- She curses, tells dirty jokes, and discusses sex around the entire department.

The record contains some evidence of specific examples of Monterrubio's alleged inappropriate behavior:

---

[66] 523 U.S. at 80-81.

- She made comments about three other co-workers' breasts, including whether they had breast implants.

- Two male coaches complained that she made a sexual innuendo to them regarding a hurdler stretch.

- She talked to a male coach about his body, weight loss, and use of diet pills.

- She told specific dirty jokes and stories about her personal sexual adventures to a group of male and female coaches at least five times.

- She showed nude photographs of men to other male and female coaches twice.

- She told both Clark and another male coach that they would make a good couple and should "hook up."

- She forwarded a series of mildly profane and off-color email jokes and cartoons to several people.

This evidence shows significant, similar inappropriate conduct toward both male and female co-workers, which does not raise an inference of discrimination based on sex.[67] Clark argues Monterrubio treated her worse than the male coaches, but at best, Clark documents many more particular instances of abuse against her *personally* than any other co-worker, male or female. Evidence that Clark was targeted as an individual does not raise an inference of gender-based discrimination under this comparative-based evidentiary route.[68]

---

[67] *Cf. Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1096 (10th Cir. 2005) (finding sufficient evidence under third route because harasser "regularly directed sexually charged, humiliating, and hostile comments towards women but would not do the same towards men").

[68] *See Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1124 (D.C. Cir. 2002) (concluding plaintiff had not shown harasser treated men differently than women but that they "targeted Davis because of his behavior as an individual rather than because of his sex").

### 5. Comments About Gender-Specific Anatomy and Characteristics do not Alone Raise an Inference that Harassment is Because of Gender

The court of appeals did not rely on an *Oncale* evidentiary route, summarily holding that Clark raised a fact issue concerning gender-based harassment because "the bulk of Monterrubio's comments relate to the fact that Clark is female" and "Monterrubio made a significant number of comments to Clark about Clark's female anatomy, i.e., her breasts, as well as her buttocks."[69] The dissent adopts a similar approach, concluding that the because-of-sex requirement can be met simply—and solely—by showing that at least some of the harasser's comments referred to gender-specific anatomy and characteristics. Though we agree that gender motivation may be proven outside *Oncale*'s framework, we disagree with the dissent's and lower court's analysis.

Factually, the record does not support a conclusion that "the bulk" of the relevant comments "relate to the fact that Clark is a female," as the court of appeals stated,[70] or that the conduct "focused" on Clark's gender-specific anatomy, as the dissent concludes.[71] Clark made over one hundred wide-ranging complaints, covering topics such as profanity, dirty jokes, rudeness, ostracism, petty slights, political views, atheism, pranks, and having her parenting and teaching skills criticized. None of these relate to Clark's female anatomy. To claim that Clark's female body was the main focus of Monterrubio's comments misstates the record.

In addition to factual issues, focusing only on gender-specific anatomy and ignoring motivation is legally unsound and relies on a misreading of *Oncale*. *Oncale* does mention "sex-specific and derogatory" behavior, but it expressly tied that language to proving general

---

[69] ___ S.W.3d ___, 2015 WL 6163252, at *5 & n.2.

[70] *Id.* at *5.

[71] *Post* at 12-13, 21.

hostility to one gender in the workplace under the second evidentiary route rather than as a stand-alone evidentiary path.[72]   Thus, the dissent is incorrect to position this theory as an established alternative evidentiary route supported by *Oncale*'s text.

A line of opposite-gender harassment cases uses *Oncale*'s "sex-specific and derogatory terms" language[73] to argue that such behavior creates an inference of discrimination without regard to the underlying motivation.[74]   Such conduct could support an inference of sex discrimination in an opposite-gender case where, for example, the men in a mostly male environment mistreat a woman in gender-specific ways making it clear they disapprove of women in their workplace.[75] Though we need not pass on the validity of the analysis these cases employ, at a minimum, they illustrate the importance of context; a woman harassing another woman in an all-female environment naturally raises different inferences than a man harassing the only woman in an otherwise male workplace.  The dissent cites many of these cases as if they necessarily apply with equal force in same-gender cases.  The dissent's theatrical device of switching the gender of the harasser for illustrative purposes is an analytically inapt oversimplification that bypasses an inquiry into the reasonableness of the inferences that may be drawn.  Only reasonable inferences can be credited in a legal-sufficiency review.

---

[72] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

[73] *Id.*

[74] *See, e.g., Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331-32 (4th Cir. 2011); *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 327 (4th Cir. 2010); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811-12 (11th Cir. 2010); *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 229 (1st Cir. 2007); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 332-33 (4th Cir. 2003).  Several pre-*Oncale* cases used similar analysis.  *See, e.g., Doe v. City of Belleville*, 119 F.3d 563, 577-78 (7th Cir. 1997), *cert. granted, vacated, & remanded*, 523 U.S. 1001 (1998) (vacated and remanded for reconsideration in light of *Oncale*); *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000-01 (10th Cir. 1996); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463-64 (9th Cir. 1994).

[75] *See, e.g., Hoyle*, 650 F.3d at 326, 332; *Reeves*, 594 F.3d at 803, 812-13; *Ocheltree*, 335 F.3d at 332.

Regardless of how it might apply in opposite-sex cases, a standard that considers only the sex-specific nature of harassing conduct without regard to motivation is clearly wrong in same-sex cases. The Supreme Court was abundantly clear that gender motivation is not established "merely because the words used have sexual content or connotations."[76] The Court rejected pre-*Oncale* lower-court authority holding "workplace harassment that is sexual in content is always actionable, regardless of the harasser's sex, sexual orientation, or motivations."[77] Consistent with *Oncale*, many courts in same-sex cases have recognized that crude, gender-specific vulgarity alone is insufficient to show that harassing behavior is because of gender.[78]

Furthermore, that a comment relates to a woman's body says nothing about the speaker's motive.[79] The TCHRA is not a strict liability statute that mandates a finding of sex discrimination for any mention of a gender-specific body part. Motivation, informed by context, is the essential inquiry.[80] Why matters. In other words, the bare act of one woman speaking to another woman about her female anatomy does not establish the comments were gender motivated.

---

[76] *Oncale*, 523 U.S at 80.

[77] *Id.* at 79 (citing *Doe*, 119 F.3d at 577-78); *see also Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 263 n.5 (3d Cir. 2001) (explaining how *Doe*'s holding "that where the harassment was sexual in nature, it was not necessary for the plaintiff to prove that it was motivated by the victim's gender" was "clearly wrong in light of *Oncale*'s requirement that all sexual harassment plaintiffs must prove that the harassment was discrimination because of sex"); *EEOC v. Trugreen Ltd. P'ship*, 122 F. Supp. 2d 986, 990 (W.D. Wisc. 1999) (noting *Oncale*'s explicit disapproval of *Doe*'s holding regarding gender motivation when the harassment has explicitly sexual overtones).

[78] *See, e.g., McCown v. St. John's Health Sys., Inc.*, 349 F.3d 540, 543 (8th Cir. 2003) ("[C]rude gender-specific vulgarity is not, by itself, probative of gender discrimination."); *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 261 (4th Cir. 2001) (stating plaintiff cannot rely on the sex-specific nature of harasser's comments "without producing plausible evidence that such comments were animated by Bragg's hostility to Lack as a man"); *English v. Pohanka of Chantilly, Inc.*, 190 F. Supp. 2d 833, 844 n.9 (E.D. Va. 2002) ("easily dispatch[ing]" argument that the sex-specific nature of the harassing comments alone shows the conduct was based on sex).

[79] *See Lack*, 240 F.3d at 260 (distinguishing between "harassment that is sexual in content" and "harassment that is sexually motivated").

[80] *See Oncale*, 523 U.S. at 79-81.

32

Taking all of her evidence as true, Clark experienced misery at work that no employee should endure. But it is not an actionable TCHRA violation. No reasonable juror could find that Clark's gender motivated the conduct toward her, and thus immunity has not been waived as to her sexual-harassment claim.

## C.    Retaliation

As a companion to its anti-discrimination provision, the TCHRA prohibits retaliation against an employee for engaging in certain protected activities, such as reporting sexual harassment.[81]   Retaliation claims can be actionable under the TCHRA even if the underlying discrimination claim is not. The parties here dispute whether the evidence is sufficient to raise a fact issue as to the extent of Clark's protected activity and whether engaging in such activity caused a material adverse employment action.

In discrimination and retaliation cases under the TCHRA, Texas jurisprudence parallels federal cases construing and applying equivalent federal statutes, like Title VII. Accordingly, we follow the well-settled proof principle that statutory violations can be established with either direct or circumstantial evidence.[82]

Because smoking guns are hard to come by,[83] the three-part *McDonnell Douglas* burden-shifting framework enables an employee to establish discrimination with circumstantial evidence.[84]   If the employee can establish a prima facie case of discrimination, a rebuttable

---

[81] *See* TEX. LAB. CODE § 21.055; *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015).

[82] *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476-77 (Tex. 2001).

[83] *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983).

[84] *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

presumption of discrimination arises, which can alone sustain a discrimination claim.[85]  But the employer can defeat this presumption merely by producing evidence of a legitimate, nondiscriminatory reason for the disputed employment action.[86]  Once rebutted, the presumption disappears, and an employee lacking direct evidence cannot prove a statutory violation without evidence that the employer's stated reason is false and a pretext for discrimination.[87]  In both direct- and circumstantial-evidence cases, the burden of persuasion remains at all times with the employee.[88]  These three burden-shifting steps apply to retaliation claims,[89] but the precise evidentiary elements of the prima facie case differ from discrimination cases due to the nature of the claims.

To establish a prima facie case of retaliation, an employee must show:  (1) she engaged in an activity protected by the TCHRA, (2) she experienced a material adverse employment action, and (3) a causal link exists between the protected activity and the adverse action.[90]  The causation standard for the *McDonnell Douglas* prima-facie-case element is not onerous and can be satisfied merely by proving close timing between the protected activity and the adverse action.[91]  However, if the employer provides evidence of a legitimate reason for the adverse action, under the federal standard, the employee must prove the adverse action would not have occurred "but for" the

---

[85] *Burdine*, 450 U.S. at 252-54.

[86] *Id.* at 254-55.

[87] *Id.* at 255-56; *Quantum*, 47 S.W.3d at 477.

[88] *Burdine*, 450 U.S. at 253.

[89] *McCullough v. Houston Cty.*, 297 F. App'x 282, 288 (5th Cir. 2008).

[90] *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015); *see Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006).

[91] *Evans v. City of Hous.*, 246 F.3d 344, 354 (5th Cir. 2001).

protected activity.[92]  The but-for causation standard is significantly more difficult to prove than prima facie causation.[93]  The parties dispute which of these three steps are implicated in the jurisdictional analysis and whether the evidence raises a fact issue sufficient to invoke the TCHRA's merits-based immunity waiver.[94]

The dissent concludes that TCHRA retaliation claims should be evaluated not under a but-for causation standard but by assessing whether the protected activity was a motivating factor for the adverse action.  We have yet to determine the appropriate causation standard for a TCHRA retaliation claim, but because the parties have advocated the but-for standard and have not asserted any other should apply, we apply it in this case.

### 1. Jurisdictional Facts

To support the jurisdictional plea, Alamo Heights produced evidence (1) challenging most aspects of Clark's prima facie case of retaliation, (2) asserting nonretaliatory reasons for the adverse employment actions, namely Clark's performance issues, and (3) challenging but-for causation between the alleged protected activities and the adverse employment actions.  Citing our decision in *Mission Consolidated Independent School District v. Garcia*,[95] the court of appeals limited the jurisdictional analysis to the prima-facie-case element, meaning evidence regarding the other two stages was not considered in determining whether Clark raised a fact issue regarding the immunity waiver.[96]  This was error.  All elements of a TCHRA circumstantial-evidence claim are,

---

[92] *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 520 U.S. 338, 351-52 (2013).

[93] *See Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).

[94] *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636-37 (Tex. 2012).

[95] 372 S.W.3d 629 (Tex. 2012).

[96] __ S.W.3d __, 2015 WL 6163252, at *4, 6 (Tex. App.—San Antonio 2015).

perforce, jurisdictional. If the jurisdictional evidence does not negate or rebut the prima facie case, the ensuing aspects of the burden-shifting analysis are not implicated in the jurisdictional inquiry. But if, as here, jurisdictional evidence rebuts the prima facie case, the entire *McDonnell Douglas* framework is fully implicated, and sufficient evidence of pretext and causation must exist to survive the jurisdictional plea.

In holding otherwise, the court of appeals misinterpreted *Garcia* as conscribing the jurisdictional examination. *Garcia* involved a circumstantial-evidence TCHRA age-discrimination claim.[97] The defendant filed a plea to the jurisdiction, presenting evidence challenging one element of Garcia's prima facie case.[98] Observing that "the Labor Code waives immunity from suit only when the plaintiff actually states a claim for conduct that would violate the TCHRA,"[99] we held the elements of the *McDonnell Douglas* prima facie case constitute jurisdictional facts because a prima facie case is "the necessary first step" to bringing a TCHRA claim based on circumstantial evidence.[100] The defendant's jurisdictional challenge negated an element of the prima facie case, which triggered the plaintiff's duty to raise a fact issue on the issue of discriminatory intent.[101] Because the plaintiff failed to do so, we dismissed the suit for want of jurisdiction.[102]

As a factual matter, *Garcia* involved only the prima facie case, but its core analysis is not limited to that step of the framework. Because a statutory violation is necessary to establish an

---

[97] 372 S.W.3d at 632.

[98] *Id.* at 632-33.

[99] *Id.* at 637.

[100] *Id.* at 637-38.

[101] *See id.* at 641.

[102] *Id.* at 642-43.

immunity waiver, jurisdiction and the merits intertwine.[103] And because a circumstantial-evidence case depends on the *McDonnell Douglas* framework, the burden-shifting scheme *in toto* defines the jurisdictional facts. In *Garcia*, the defendant had negated an element of the prima facie case, meaning no presumption of discrimination existed.[104] Here, the defendant rebutted the prima facie case by producing evidence of a legitimate reason for its employment actions, which means no presumption of retaliation exists. The absence of a presumption triggers the plaintiff's duty to create a fact question on the ultimate issue—whether retaliation caused the adverse employment action—to survive a jurisdictional challenge. The entire burden-shifting framework is a mechanism for proving discriminatory intent absent direct evidence, and all phases, not just the prima facie case, are relevant to the jurisdictional inquiry. We thus disapprove of those cases limiting the jurisdictional inquiry to the prima-facie-case element of a TCHRA circumstantial-evidence case.[105]

Our holding that all elements of a circumstantial-evidence TCHRA claim are jurisdictional facts aligns with our holdings in *State v. Lueck*,[106] *San Antonio Water System v. Nicholas*,[107] and our Texas Tort Claims Act jurisprudence. As we explained in those cases, some evidence of a viable claim must exist to invoke an immunity waiver tied to the merits of a claim.

---

[103] *Id.* at 635-36.

[104] *Id.* at 642.

[105] *See, e.g.*, *Alamo Heights Indep. Sch. Dist. v. Clark*, __ S.W.3d __, 2015 WL 6163252, at *4, 6 (Tex. App.—San Antonio 2015); *Tex. Dep't of State Health Servs. v. Rockwood*, 468 S.W.3d 147, 154, 157 (Tex. App.—San Antonio 2015, no pet.); *Rosenberg v. KIPP, Inc.*, 458 S.W.3d 171, 178 (Tex. App.—Houston [14th Dist.] 2015, pet. denied); *KIPP, Inc. v. Whitehead*, 446 S.W.3d 99, 112-13 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Fort Bend Indep. Sch. Dist. v. Williams*, No. 01-13-00052-CV, 2013 WL 4779693, at *3 n.4 (Tex. App.—Houston [1st Dist.] Sept. 5, 2013, no pet.).

[106] 290 S.W.3d 876, 881 (Tex. 2009).

[107] 461 S.W.3d 131, 135-36 (Tex. 2015).

In *Lueck*, we analyzed the scope of jurisdictional facts under the Whistleblower Act.[108] Like the TCHRA, the Whistleblower Act waives governmental immunity for "a violation" of the Act.[109] Because immunity waiver is bound to a statutory violation, we held the elements of a Whistleblower Act claim "must be considered in order to ascertain what constitutes a violation" and thus "the elements [of a violation] can be considered as jurisdictional facts."[110]

We followed both *Lueck* and *Garcia* in *Nicholas*, which involved a post-verdict jurisdictional plea in a TCHRA circumstantial-evidence retaliation case.[111] Analyzing the jurisdictional argument, we stated that "[t]he elements of a retaliation claim under the TCHRA are jurisdictional in nature."[112] We determined immunity was not waived, and the trial court thus had no jurisdiction, because no legally sufficient evidence supported an essential element of the claim.[113] We explained that "[l]ike a failure of proof at the prima facie stage, a failure to prove the elements of a TCHRA claim [even] after a trial on the merits deprives the trial court of jurisdiction."[114]

As we have consistently held—in *Lueck*, *Garcia*, and *Nicholas*—when the Legislature conditions an immunity waiver on the existence of a statutory violation, the elements of the violation are jurisdictional facts. When analyzing immunity waiver under the Texas Tort Claims Act, which likewise waives immunity to the extent of liability, we have also framed our

---

[108] 290 S.W.3d at 880-81.

[109] *See* TEX. GOV'T CODE § 554.0035.

[110] *Lueck*, 290 S.W.3d at 881.

[111] 461 S.W.3d at 135-36.

[112] *Id.* at 136.

[113] *Id.* at 139.

[114] *Id.* at 136.

jurisdictional analysis in terms of a claim's elements.[115] A plaintiff's failure of proof at the prima facie stage (as in *Garcia*), post-verdict (as in *Nicholas*), or anywhere in between produces the same result: no immunity waiver and no jurisdiction. Whenever the prima facie case's presumption drops out of a case, there must be other evidence to prove the claim. The second and third *McDonnell Douglas* steps are part of an integrated evidentiary framework, and exempting them from this analysis is thus erroneous.

The nature of proof in retaliation cases illuminates the point. The causation burden in the prima-facie-case element is significantly lower than the ultimate burden to prove the protected activity caused retaliation.[116] But when the prima facie case is rebutted, there is no presumption and thus no evidence of illegal intent. Permitting a *McDonnell Douglas* case to proceed to trial when the prima facie case has been rebutted and the plaintiff has not raised a fact issue on causation defies logic. More importantly, allowing a trial to proceed without evidence to sustain a claim is repugnant to the TCHRA's immunity waiver and contrary to the legitimate objectives of governmental immunity.[117]

Though Clark concedes she would be required to raise a material fact issue on pretext in a summary-judgment proceeding, she argues the plaintiff's burden to respond to a jurisdictional

---

[115] *See Lueck*, 290 S.W.3d at 882 ("In *Miranda*, we also considered elements under the Texas Recreational Use statute to determine whether immunity was waived under the Tort Claims Act." (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225 (Tex. 2004))); *City of Waco v. Kirwan*, 298 S.W.3d 618, 622, 628-29 (Tex. 2009) (analyzing governmental immunity in a Tort Claims Act suit based on the elements of duty and conscious indifference).

[116] *See Strong v. Univ. Healthcare Sys. L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).

[117] *See Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006) ("an important purpose" of sovereign immunity is "to shield the public from the costs and consequences of improvident actions of their governments"); *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002) ("Subjecting the government to liability may hamper governmental functions by shifting tax resources away from their intended purposes toward defending lawsuits and paying judgments.").

challenge should be minimal and not unnecessarily involve the merits. We reject this argument. When the merits and jurisdiction overlap, as they do in TCHRA cases, and the defendant challenges the evidence to sustain a violation, plea-to-the-jurisdiction proceedings "mirror[] that of a traditional summary judgment motion."[118] Whether by jurisdictional plea or summary-judgment motion, the plaintiff is not put to the ultimate burden of proof but must only raise a fact issue on the existence of illegal intent.

Clark asserts that if all the elements of the burden-shifting evidentiary mechanism are jurisdictional, a "plaintiff suing a governmental entity would be in the position of pleading[] facts to rebut the defendant's proffered excuse without full discovery, when the facts and details that show an excuse is false or a pretext are often solely in the control of the defendant." Clark's concerns about the impact on pleading practice are unwarranted. Once a defendant challenges the plaintiff's case *with evidence*, the jurisdictional inquiry focuses on *the evidence* and whether the plaintiff can create a fact issue.[119] The pleadings are not implicated, and if discovery is necessary, trial courts have broad discretion to permit targeted discovery and alter hearing deadlines to allow parties the opportunity to respond with evidence.[120] Clark does not argue she lacked evidence or preparation time and, indeed, has asserted that the case is ready for trial. Accordingly, we analyze whether the record contains evidence raising a fact issue.

---

[118] *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012).

[119] *See id.*; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

[120] *Garcia*, 372 S.W.3d at 642-43.

## 2. Evidence of Retaliation

Because Alamo Heights produced evidence on the prima facie case and the remainder of the burden-shifting framework, we evaluate the evidence regarding all elements of the retaliation claim.

### a. Protected Activity

An employee engages in a protected activity by, among other things, filing an internal complaint, opposing a discriminatory practice, or making a charge of discrimination with the EEOC.[121] The employee's complaint must, at a minimum, alert the employer to the employee's reasonable belief that unlawful discrimination is at issue.[122] The parties agree Clark's EEOC charge is protected activity. Clark also contends three internal complaints constitute additional protected activities: the May 14, 2008 letter to Principal Kershner; a March 2008 meeting with Kershner; and an October 2007 meeting with Michelle Boyer, the girls athletic coordinator. We disagree and conclude only Clark's EEOC charge is protected activity.

In May 2008, Clark lodged her first written complaint, a thirteen-page letter to Principal Kershner detailing an array of grievances about Monterrubio and, to a limited degree, Boyer's inaction. We conclude this letter was insufficient to put Kershner on notice that Clark was complaining that these two women were harassing her based on her gender.

As previously discussed, a handful of Clark's allegations contain a sexual component, but an overwhelming number did not. Among the more than four dozen incidents of harassment Clark

---

[121] *See* TEX. LAB. CODE § 21.055; *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015).

[122] *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 586 (Tex. 2017) ("'[P]rotected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue.'" (quoting *Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010))); *see also Harris-Childs v. Medco Health Sols., Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006) (affirming summary judgment on retaliation claim because plaintiff "has not demonstrated that she put the employer on notice that her complaint was based on racial or sexual discrimination").

catalogued in the May 14 letter, her broad-ranging complaints included mistreatment directed not only toward her but to all the other coaches, both male and female, as well as parents and students. She never even hinted that she believed she was targeted because of her gender or any other protected trait. Indeed, she ascribed the behavior to motives such as thinking she is a "snotty" Alamo Heights mom and disliking her teaching and parenting style, and she said what ultimately impelled her to make a formal complaint was Monterrubio's crude comment about Monterrubio's use of the restroom.

"Magic words" are not required to invoke the TCHRA's anti-retaliation protection.[123] But complaining only of "harassment," "hostile environment," "discrimination," or "bullying" is not enough.[124] There must be some indication of gender motivation, such as sexual propositioning or other behavior signifying Clark's belief that her gender motivated the behavior. That simply is not present in the letter. Though the letter characterized Monterrubio's behavior as "inappropriate," "offensive," "bullying," "harassment," "embarrassing," "rude," and

---

[123] *Rincones*, 520 S.W.3d at 586; *see also Brown*, 406 F. App'x at 840.

[124] *See Rincones*, 520 S.W.3d at 585-86 (holding a complaint of mistreatment compared to a co-worker the employer knew was of a different race was insufficient to raise a fact issue that the employee alerted the employer to a race-discrimination complaint); *see also Gordon v. Acosta Sales & Mktg., Inc.*, 622 F. App'x 426, 431 (5th Cir. 2015) (affirming summary judgment for employer on retaliation claim because employee's complaint "was a personal grievance rather than a complaint resulting from illegal discrimination"); *Brown*, 406 F. App'x at 840 (concluding an employee's complaint of "discrimination" was not reasonably based on race but on other motives); *Harris-Childs*, 169 F. App'x at 916 (rejecting notion that any complaint of "harassment" encompasses either race or sex); *Warrick v. Motiva Enters.*, No. 14-13-00938-CV, 2014 WL 7405645, at *8 (Tex. App.—Houston [14th Dist.] Dec. 30, 2014, no pet.) (mem. op.) (summary judgment appropriate on retaliation claim because plaintiff's email "does not allege that either her co-worker's treatment or the alleged bullying against her were based on a protected characteristic"); *Cty. of Travis v. Manion*, No. 03-11-00533-CV, 2012 WL 1839399, at *6 (Tex. App.—Austin May 17, 2012, no pet.) (mem. op.) ("Although Manion referred once to 'discriminatory treatment' and used the terms 'hostile actions,' 'hostile treatment,' 'hostile activity,' and 'harassment,' the charge contains no suggestion that the 'discriminatory' or 'hostile' treatment or 'harassment' was based on gender . . . and thus contained no allegations that would serve to put the County on notice that she intended to complain of discriminatory conduct based on sex," particularly in light of the alleged harasser also being female); *Martinez v. Wilson Cty.*, No. 04-09-00233-CV, 2010 WL 114407, at *1, 3-4 (Tex. App.—San Antonio 2010, no pet.) (mem. op.) (concluding plaintiff's written "Notice of Hostile Work Environment" complaining of rude and offensive behavior did not suggest any motivation based on a protected characteristic).

42

"intimidating," a jury could not reasonably conclude Clark alerted Principal Kershner that she thought Monterrubio was acting out of sexual desire towards her or that her conduct otherwise constituted sex-based discrimination.

The dissent argues the allegations it concludes show gender-based harassment also indicate Clark notified Kershner of her belief she was harassed because of her gender. We disagree. As previously mentioned, two versions of the May 14 2008 letter are in the record—one bearing Clark's signature that she gave Kershner and an unsigned version Clark attached to her EEOC charge. Neither version communicates any belief that Monterrubio or Boyer were sexually attracted to Clark. Clark did not write that either of them sexually propositioned her, sexually touched her, or engaged in any sexually suggestive conduct toward her. Indeed, the only discussions of sexual activity involved Monterrubio's relations with several men, jokes about sex with men, and nude photos of men. Neither version of the letter mentions (1) that Monterrubio and Boyer grabbed Clark's behind during the Christmas photos, (2) the cupcake-licking incident, (3) that Monterrubio said she used Clark's razor to shave her genitals, (4) Monterrubio's statement "I wonder if Coach Clark swallows," (5) gossip that Monterrubio and Boyer might be homosexual, or (6) that Monterrubio looked at her in a "creepy way" or was "hitting on" her. Moreover, the version Clark gave Principal Kershner (1) omits Monterrubio's comments at the new teacher orientation about a different woman's breasts, (2) leaves out Monterrubio's purported statement that she would think about Clark during sex while using the candle Clark gave her, and (3) uses the word "breasts" rather than "tits" to describe an incident. These details are all material to the dissent's analysis, but because they were not included in the May 14 letter Clark gave Kershner, they cannot be considered in determining whether Clark alerted Kershner at that time of any reasonable belief that her complaint was based on sex.

Clark also asserts she "reported the sexual harassment" to Kershner during a March 2008 performance review meeting. Unlike the May letter two months later, where Clark exhaustively delineates her allegations, Clark provides no details about this exchange. Clark evidently did not report in March the then-existing details contained in the May letter because, in the letter, she stated she was "just now reporting this" because she feared retaliation and expected the problems to be addressed other ways. Whatever Clark said to Principal Kershner in the March meeting, no evidence indicates Clark communicated any belief that her problems with Monterrubio were gender based.

Clark says she told Boyer in October 2007 she "was tired of the jokes Ann made me the butt of." This complaint to Boyer also does not qualify as protected activity because it does not indicate a belief that Monterrubio told the jokes based on Clark's gender. Moreover, Boyer was not a decisionmaker for any adverse employment action, and there is no evidence Kershner knew about this conversation.[125] Indeed, Clark has repeatedly asserted in this litigation that Boyer violated school policy by *not* reporting her complaints to Kershner or human resources. Thus, this complaint is not protected activity.[126]

None of the internal complaints constitute protected activity under the TCHRA, meaning the only protected activity supported by the record is Clark's October 2008 EEOC charge.

---

[125] *See Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999) (concluding decisionmaker could not have retaliated based on protected activity of which it was unaware).

[126] At Kershner's invitation, Clark spoke with the school counselor. Whether Clark also contends her conversations with the school counselor are protected activity is unclear. If so, this argument fails because the school counselor was not a decisionmaker, and no evidence exists that Kershner knew the details of these confidential conversations.

### b. Adverse Employment Action

The TCHRA does not protect employees from all retaliatory employment action, only from actions that are "materially adverse."[127] Materially adverse "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[128] This objective materiality requirement is necessary "to separate significant from trivial harms."[129] "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."[130]

Clark complained of a host of retaliatory conduct, including many of the incidents from the May 14 letter and essentially every unpleasant experience after filing her EEOC charge. The two most significant are (1) being placed on the growth plan and (2) termination. Termination is unquestionably a materially adverse employment action. As to the growth plan, courts' treatment of such plans has varied, in part depending on the nature of the plan and the consequences for not completing it.[131] Principal Kershner warned Clark that failure to complete the plan could result in termination, and Clark was, in fact, terminated for not completing the plan, among other deficiencies. Given the actual consequences for failure to comply with it, we hold that implementing the growth plan constituted a materially adverse employment action in this case.[132]

---

[127] *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006); *see also Montgomery Cty. v. Park*, 246 S.W.3d 610, 614 (Tex. 2007).

[128] *Burlington*, 548 U.S. at 68 (internal quotation marks omitted).

[129] *Id.*

[130] *Id.*; *see also Park*, 246 S.W.3d at 614-15.

[131] *See Henry v. Abbott Labs.*, 651 F. App'x 494, 505 (6th Cir. 2016); *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003); *Emami v. Bolden*, 241 F. Supp. 3d 673, 685 (E.D. Va. 2017).

[132] *See Henry*, 651 F. App'x at 505 (concluding a performance improvement plan was an adverse employment action because it rendered the employee ineligible for promotion); *Emami*, 241 F. Supp. 3d at 685 (finding a

The remaining retaliation allegations are easily dispatched. Courts have repeatedly held that complaints of ostracism and personality conflicts,[133] unfair criticism,[134] and heated exchanges[135] are petty annoyances, not conduct likely to deter an employee from making a discrimination complaint. The same is true for not sharing food,[136] workplace issues like being excluded from meetings and micromanaged,[137] interfering with personal property,[138] and intentionally annoying behavior such as playing loud music.[139]

Clark complained that Monterrubio pushed her, bumped into her several times, and once chased Clark in her car. These are different in character than her other retaliation complaints but still do not rise to the level of material adversity, and they involved only Monterrubio, a co-worker, rather than a decisionmaker.

### c. Causation

Finally, we must evaluate the evidence to determine whether it raises a fact issue causally linking Clark's filing an EEOC charge with her placement on a growth plan or termination. We conclude Clark has not raised a fact issue on causation, and thus immunity has not been waived for this claim.

---

performance improvement plan was an adverse employment action because it was "actually implemented, and it imposed conditions with which his failure to comply ultimately led to termination of employment").

[133] *See Burlington*, 548 U.S. at 68; *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009).

[134] *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012).

[135] *See Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 442-43 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

[136] *See Burlington*, 548 U.S. at 69.

[137] *See Grice v. FMC Techs. Inc.*, 216 F. App'x 401, 404, 407 (5th Cir. 2007); *Donaldson*, 495 S.W.3d at 442-43.

[138] *See Stewart*, 586 F.3d at 332; *Muniz v. El Paso Marriott*, 773 F. Supp. 2d 674, 682 (W.D. Tex. 2011).

[139] *See Burlington*, 548 U.S. at 68.

### i. Growth Plan

To state a prima facie case, Clark need only show a minimal causal link between the protected activity and the adverse action.[140] Clark filed her EEOC charge in October, and Principal Kershner placed her on the growth plan about two to three weeks later. Clark contends the very close temporal proximity between those events demonstrates prima facie causation. Though this degree of temporal proximity would otherwise raise a fact issue on prima facie causation,[141] undisputed evidence establishes Kershner and a human resources representative made the decision to implement the growth plan before they knew of Clark's charge. Carrying out a previously planned employment decision is no evidence of causation.[142] Thus, Clark's retaliation claim based on implementation of the growth plan fails at the prima-facie-case stage.

### ii. Termination

Assuming Clark stated a prima facie retaliation case based on her termination, any presumption raised by that has been rebutted because Alamo Heights produced evidence of many performance reasons for terminating Clark's employment. Clark's burden to raise a fact issue that this explanation is a pretext and that she would not have been terminated but for filing an EEOC charge has, therefore, been activated.[143]

In evaluating but-for causation evidence in retaliation cases, we examine all of the circumstances, including temporal proximity between the protected activity and the adverse action,

---

[140] *See Evans v. City of Hous.*, 246 F.3d 344, 354 (5th Cir. 2001).

[141] *See id.*

[142] *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [employment actions] upon discovering that [an EEOC charge] has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

[143] *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason is false.[144] Analyzing these factors as a whole, we conclude no genuine fact issue about causation exists.

Temporal proximity is relevant to causation when it is "very close."[145] Eight months passed between the EEOC charge and Principal Kershner's termination recommendation. That gap is so long as to be of little, if any, probative value.[146]

It is undisputed that Principal Kershner knew of Clark's EEOC charge. Clark testified in her deposition that Kershner expressed a negative attitude toward her complaints, stating there would be "consequences" for them. This comment is vague and so devoid of context as to have barely a scintilla of probative value. Kershner gave Boyer a role in monitoring Clark's growth-plan compliance by requiring reports of weekly meetings, even though Clark had accused Boyer of harassment. This, according to Clark, demonstrates a negative attitude toward her complaints. However, all complaints of inappropriate conduct in the May 14 letter are directed toward Monterrubio, not Boyer. After a series of specific alleged retaliatory complaints directed at Boyer and others, Kershner amended the growth plan to eliminate the requirement of a weekly meeting with Boyer. Kershner encouraged Clark to report upsetting incidents, encouraged Clark to work with the school counselor to address issues of concern, and transferred Monterrubio to another

---

[144] *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex. 2000).

[145] *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).

[146] *See Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 286-87 (5th Cir. 2015) ("We have found a five month period between the protected activity and the adverse employment action insufficient to establish a causal link.").

48

campus at Clark's request. These actions do not show a negative attitude toward Clark's complaints.

The record bears some evidence that Alamo Heights did not follow relevant policies. Principal Kershner repeatedly reprimanded Clark for disregarding the district's formal grievance procedure in lodging her complaints, but as the Alamo Heights human resources representative confirmed, those policies do not apply to discrimination or retaliation complaints. It is undisputed that Kershner herself failed to comply with a district policy because she did not notify the superintendent in writing about all of Clark's complaints. This factor weighs in Clark's favor.

A comparison to similarly situated employees does not favor Clark in the causal analysis. "Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct."[147] Clark claims Kershner singled her out by admonishing her for bringing her daughter to work during school hours, but allowed other employees to do so. Kershner explained to Clark that her situation differed from other employees because her children were very young, required constant supervision, and could not safely be at school during instructional hours. Clark also alleges she was treated worse than Monterrubio because Monterrubio was not terminated. Kershner placed Monterrubio on a growth plan the same day as Clark, transferred her to another campus, and did not recommend her for a term contract. Monterrubio was not terminated, but there is no evidence her work performance was deficient in as many areas as Clark or that similar behavior continued after she was transferred. Thus, Clark has no evidence of mistreatment compared to similarly situated employees.

---

[147] *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (footnotes and citations omitted).

In a similar vein, no evidence shows the reasons for Clark's termination were false. Principal Kershner first counseled Clark—months before the EEOC charge and even months before the May 14 letter—regarding two main items in the growth plan, specifically, improving communications with co-workers and not bringing her children to work. These problems persisted throughout Clark's employment. Other performance problems arose after Clark filed her charge, such as Clark being untruthful about violation of a standardized-testing-protocol issue, which Clark had admitted. Kershner additionally received reports, which she investigated and credited, that Clark had been neglecting her coaching duties. It was further discovered Clark had not been following lesson plans and maintaining student grades. Kershner also concluded Clark was the root of severe discord and dysfunction in the girls athletic department. Kershner gave Clark a poor performance evaluation based on these and many other performance issues, leading to her termination. An employer is not forbidden from addressing performance issues involving employees who have engaged in protected activity, including following through on known pre-existing issues[148] and addressing existing issues that come to light only during subsequent investigation.[149] Clark denies nearly all of these performance issues, but such denials are insufficient to create a fact issue as to causation.[150] The issue is whether the employer's perception

---

[148] *See Bacon v. EDS*, 219 F. App'x 355, 358 (5th Cir. 2007).

[149] *See Lawson v. Parker Hannifin Corp.*, 614 F. App'x 725, 731 (5th Cir. 2015) (finding a prior positive evaluation did not create a fact issue as to retaliation because the employer discovered prior misconduct after the review had been completed); *Plumlee v. City of Kennedale*, 795 F. Supp. 2d 556, 564 (N.D. Tex. 2011) ("Plaintiff is not immune from adverse action for misconduct merely because defendant learned of the misconduct during its investigation of plaintiff's race-discrimination complaint.").

[150] *See Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) ("Jackson's assertion of innocence alone does not create a factual issue as to the falsity of Cal-Western's proffered reason for terminating him."); *Evans v. City of Hous.*, 246 F.3d 344, 355 (5th Cir. 2001) (stating plaintiff "cannot survive summary judgment merely because she disagrees with the [employer]'s characterization of her disciplinary history").

of the problems—accurate or not—was the real reason for termination.[151]  The record bears no evidence the stated reasons were mere pretext.

Some evidence shows Alamo Heights did not follow all of its policies in dealing with Clark, but the remaining causation factors weigh heavily in Alamo Heights's favor.  We conclude no fact issue exists that Clark would not have been terminated but for her EEOC charge.  Thus, immunity has not been waived as to this claim, and Alamo Heights's jurisdictional plea should have been granted.

### III.    Response to the Dissent

The dissent agrees that the jurisdictional inquiry is not limited to the prima-facie-case element of a circumstantial-evidence case,[152] but diverges from the Court on the resolution of Clark's sexual-harassment and retaliation claims.  As an analytical crutch, the dissent begins with a hypothetical that materially alters the facts, presents a misleading and incomplete recitation of Clark's allegations, and inaccurately compresses the time frame.  Changing the facts is obviously misleading, but more subtle and significant errors infect the dissent's analysis.  Simply stated, the dissent is wrong on the standard of review, the record, and the law. [153]

---

[151] *See Evans*, 246 F.3d at 355; *Waggoner v. City of Garland*, 987 F.2d 1160, 1165-66 (5th Cir. 1993).

[152] *Post* at 31.

[153] The dissent takes issue with our characterization of its alteration of the facts, suggesting the "one and only fact" changed—that the harasser is male instead of female—is not material.  Regardless of any other factual issues, that change alone is, in fact, material and undermines the dissent's entire analysis. Whatever the legal-sufficiency standard requires, it does not permit courts to present a retelling of events that creates a misleading impression of the record.  Nor need we do all the work in correcting the dissent's account.  While the dissent purports to be telling "[Clark's] story as she herself would tell it, based on the facts her evidence supports," the dissent is admittedly changing the story and, moreover, omitting the *bulk* of *her* story because it is inconvenient to the dissent's analysis. This simply confirms the dissent's inability to adhere to the standard of review.

51

## A.       Standard of Review

Though we must view the evidence and its inferences in the light most favorable to Clark, we cannot disregard unfavorable evidence and inferences that reasonable jurors could not.[154] This includes evidence showing the context in which events occurred, regardless of whether it is favorable to Clark.[155]

Though citing the legal-sufficiency standard, the dissent contravenes it by failing to credit evidence a reasonable juror could not disregard and by ignoring *City of Keller*'s admonitions regarding contextual evidence. What the dissent characterizes as conflicting evidence about Monterrubio's motives for harassing Clark is actually Clark's own account. Clark provides essential context to understanding her own allegations, including her explanations regarding the motives behind Monterrubio's behavior. A reasonable juror could not ignore Clark's account of the "constellation of surrounding circumstances, expectations, and relationships . . . not fully captured by a simple recitation of the words used or the physical acts performed."[156] Nor can we.

Disregarding voluminous evidence of context that winnows the inferences a reasonable juror could credit, the dissent isolates discrete acts contrary to the legal-sufficiency standard as painstakingly set forth in *City of Keller*. Ignoring context is impermissible because it perverts the legal inquiry, much the same way isolating words and phrases from context contorts the meaning and intent of a statute. As explained in *City of Keller*, context is critical in a legal-sufficiency review because "the lack of supporting evidence may not appear until all the evidence is reviewed

---

[154] *See City of Keller v. Wilson*, 168 S.W.3d 802, 807, 822 (Tex. 2005).

[155] *See id.* at 811-12.

[156] *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998).

in context."[157]  So, for example, we observed that an alleged defamatory publication must be viewed as a whole, rather than considering only the false statements and disregarding the true ones.[158]  All of a contract's provisions, not just the provisions favoring one party, must be considered when construing its meaning.[159]  Similarly, claims for intentional infliction of emotional distress, like sexual-harassment claims, require consideration of the context and parties' relationship.[160]  Thus, "[i]n our no-evidence reviews of successful claims, we have invariably reviewed not just evidence showing the conduct was outrageous, but also evidence showing that, in context, it was not."[161]

Though purporting to analyze context, the dissent actually distorts it.  The dissent recites specific details of a handful of cherry-picked incidents but then fails to account for those details in its analysis, and it ignores the overall relationship between Monterrubio and Clark—two women— in analyzing those few incidents.  The dissent argues that gender-based conduct can provide context showing that other facially-neutral conduct is also motivated by gender-based animus.[162]  We agree.  This analysis depends, however, on first concluding that some conduct is in fact gender based, and the evidence here does not raise a fact issue that Clark's gender motivated any of Monterrubio's conduct.  The dissent falls into the trap of assuming, in a same-sex harassment case

---

[157] 168 S.W.3d at 811.

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Id.* at 812.

[162] *Post* at 18.

no less, that any behavior with sexual connotations is automatically gender based. The Supreme Court in *Oncale* made clear that doing so is incorrect.[163]

The dissent's focus on raunchy details rather than the full context of Clark's allegations distorts the legal-sufficiency analysis. This impugns not only the dissent's gender-motivation discussion but also the retaliation analysis, which expressly relies on the same facts in assessing whether Clark's May 14 letter sufficiently alerted Principal Kershner that her complaint was about sex-based discrimination.

### B.      Sexual Harassment—Faulty Legal Analysis

Though we are all concerned about the plight of sexual-harassment victims, this case must be judged on its own facts and the applicable law, which the dissent overlooks in key respects.

#### 1.  This is a Same-Sex Harassment Case

Focusing on the few relatively salacious incidents, the dissent overlooks the fundamental foundation of this case—the harasser and victim are both the same gender. That dynamic creates different inferences than if the relevant parties are opposite sex, which is why the Supreme Court in *Oncale* went to great pains to lay out ways a same-sex plaintiff can prove sexual harassment.

This dissent never satisfactorily tackles this issue, resorting instead to the artifice of pretending Monterrubio is a man, citing opposite-sex harassment cases, and acting like the same rules automatically apply. They don't. If they did, it would not have taken a Supreme Court case to resolve a circuit split over the threshold issue of whether same-sex harassment was even actionable under Title VII.

---

[163] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

Changing the gender of the harasser necessarily alters what inferences are reasonable under the circumstances. For example, a man discussing his marital problems with a female co-worker might raise a reasonable inference that he is flirting with her, whereas a woman discussing her marital problems with a female co-worker, without more, would not. Materially altering the nature of the relationship is a contrivance with zero analytical value.

The closest the dissent comes to analyzing the issue is citing *Casiano v. AT&T Corp.*[164] for the proposition that if Monterrubio had been male, we would unquestionably find a fact issue exists regarding gender motivation. *Casiano* did involve a gender-swapping scenario, but of a completely different type—the harasser was female, and the victim was male.[165] That case, which involves an opposite-gender relationship, does not support flipping the gender of the harasser and applying the same inferences to a same-sex harassment case.

## 2. Defective Legal Analysis Regarding Sexual-Desire Motivation

The dissent concludes a fact issue exists that Monterrubio was motivated by sexual desire towards Clark under *Oncale*'s first evidentiary route. This analysis is lacking in several respects.

After taking a narrow view of the evidence and crediting gossip and Clark's subjective beliefs, the dissent concludes Clark has raised a fact issue that Monterrubio was motivated by sexual desire. The dissent then asserts that the Court acknowledges sexual-desire evidence exists in this case but disregards it in favor of conflicting evidence regarding other motives.[166] We do no such thing. Rather, we view all competent evidence—not just a handful of the flashiest

---

[164] *Post* at 23 n.7 (citing *Casiano v. AT&T Corp.*, 213 F.3d 278, 285-86 (5th Cir. 2000)).

[165] *See Casiano*, 213 F.3d at 280.

[166] *Post* at 16.

examples—and conclude the only reasonable inference is that Monterrubio acted for reasons other than Clark's gender.

The dissent gives short shrift to Clark's evidence of other motives for Monterrubio's conduct. The dissent implies these motives, like personal animus or jealousy, are irrelevant because they do not excuse a "steady stream of sexual harassment."[167] As we discussed earlier, this logic is circular because it assumes the conduct is sexually harassing without analyzing whether it actually is.

The dissent focuses on Monterrubio's targeting of Clark for mistreatment, but that is not the issue. The issue is *why* Monterrubio targeted Clark. Thus, the dissent's *Ochletree v. Scollon Productions* citation is inapposite because the plaintiff there—the only woman in an all-male workplace—was targeted because the men wanted to make the only woman present feel uncomfortable.[168] That sex-based motivation is absent here. Contrary to the dissent's implication, we recognize that conduct need not be overtly sexual to support a sexual-harassment claim.[169] But, even as the dissent's own authority recognizes, sex-neutral conduct must still be linked to gender to be relevant to sexual harassment.[170] As one of these cases aptly stated, "[t]he evidence must allow a reasonable jury to conclude that her mistreatment was due to her gender. In this regard, harassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to . . . gender, manage to make themselves disliked."[171]

---

[167] *Post* at 27-28.

[168] *Post* at 28 (citing *Ochletree v. Scollon Prods., Inc.*, 335 F.3d 325, 332-33 (4th Cir. 2003)).

[169] *Post* at 25.

[170] *Post* at 25 n.9 (citing *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008), *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007), and *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999)).

[171] *Ziskie*, 547 F.3d at 226.

### 3. Gender-Specific Anatomy and Characteristics Theory Unsupported and Unworkable

The dissent crafts what it purports to be an established alternative evidentiary path supported by *Oncale*'s language to prove same-sex harassment. As the dissent tells it, comments and conduct regarding "gender-specific anatomy and characteristics" in and of themselves "constitute discrimination 'because of' sex."[172] Under this strict-liability theory, any conduct that "'would not have occurred if [the plaintiff] were not a woman'" automatically meets the because-of-sex test.[173] And this is all without regard to the harasser's motivation for the behavior.[174] That a comment can only be said to a woman does not establish that the speaker was motivated by her gender to make the comment. The dissent fundamentally misunderstands this distinction. Of course, gender-specific conduct is relevant in determining whether the harasser acted because of the plaintiff's gender. But that is the beginning of the inquiry, not the end. In holding otherwise, the dissent misstates the controlling legal authority, ignores contrary authority, and relies on inapplicable authority, leading to a theory that produces absurd results.

*Oncale* provides, as a second evidentiary route, that an inference of discrimination arises "if a female victim is harassed in such sex-specific and derogatory terms by another woman to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace."[175] The dissent claims that *Oncale* supports its stand-alone gender-specific-characteristics theory, stating "'sex-specific and derogatory terms' and conduct

---

[172] *Post* at 21.

[173] *Post* at 22 (quoting *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir. 1996)).

[174] *Post* at 21, 26-27.

[175] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

may support an inference of discrimination because of sex."[176] *Oncale* clearly tied that language to proving that the "harasser is motivated by general hostility" to the presence of her gender in the workplace.[177] It is disingenuous to position this theory as established and flowing from *Oncale* when, in reality, it depends on the dissent reading only half of the relevant language.

*Oncale* and many other courts analyzing same-sex harassment cases have emphasized the importance of evidence establishing the harasser's motive, a fact the dissent ignores. *Oncale*'s evidentiary routes expressly focus on motive.[178] We cite many same-sex cases, which the dissent does not address, where courts have found contact with gender-specific body parts, including genitals, not to be gender motivated but motivated by other factors.[179]

Instead of relying on *Oncale*'s full language and other relevant same-sex cases, the dissent cites seven other inapplicable and erroneous authorities.[180] Five of these involve mixed-sex scenarios, which cannot automatically be translated to the same-sex context.[181] For example, two of those four cases involve harassment of a woman in an all-male workplace in ways making clear that women were unwelcome.[182] Others involve conduct directed at women qualitatively different

---

[176] *Post* at 22 (quoting *Oncale*, 523 U.S. at 80).

[177] 523 U.S. at 80.

[178] *See id.* at 80-81.

[179] *Supra* note 57.

[180] *Post* at 21-22 (citing *Redd v. N.Y. Div. of Parole*, 678 F.3d 166 (2d Cir. 2012), *EEOC v. Fairbrook Med. Clinic*, 609 F.3d 320 (4th Cir. 2010), *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798 (11th Cir. 2010), *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225 (1st Cir. 2007), *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061 (9th Cir. 2002), *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996 (10th Cir. 1995), and *Steiner v. Showboat Operating Co.*, 25 F.3d 1459 (9th Cir. 1994)).

[181] *See Fairbrook*, 609 F.3d at 322; *Reeves*, 594 F.3d at 804; *Forrest*, 511 F.3d at 226; *Winsor*, 79 F.3d at 998; *Steiner*, 25 F.3d at 1461.

[182] *See Reeves*, 594 F.3d at 803, 805; *Winsor*, 79 F.3d at 998-99.

than conduct directed at men.[183]  One addresses a failed heterosexual romantic relationship, which was inherently linked to sexual desire, and a series of gender-specific epithets not present here.[184] Two are pre-*Oncale* cases of questionable authority, particularly *Winsor*, which relies on a gender-neutral-motive standard inconsistent with *Oncale*.[185]

The dissent cites only two same-sex cases[186] for this theory— *Redd v. New York Division of Parole*[187] and *Rene v. MGM Grand Hotel, Inc.*[188]—and neither is persuasive.  These cases do not, as the dissent states, hold that comments based on gender-specific anatomy is an alternative evidentiary route for proving same-sex harassment under *Oncale*.  Further, *Redd* holds that repeated rubbing and feeling of intimate body parts (in that case, breasts) can give rise to an inference of sexual advances and desire, hardly a controversial proposition.[189]  Those facts are a far cry from this case.  *Rene* also involves qualitatively more extreme physical contact than alleged here, including repeatedly grabbing the plaintiff's testicles and poking fingers in his anus through his clothing.[190]  Further, as the *Rene* dissent points out, the majority there (1) misread *Oncale* as holding that similar facts in that case could meet the elements of a sexual-harassment claim when,

---

[183] *See Fairbrook*, 609 F.3d at 327; *Steiner*, 25 F.3d at 1463.

[184] *See Forrest*, 511 F.3d at 226, 229.

[185] *See Winsor*, 79 F.3d at 1001; *see generally Steiner*, 25 F.3d at 1459-67.

[186] *Post* at 13.

[187] 678 F.3d 166 (2d Cir. 2012).

[188] 305 F.3d 1061 (9th Cir. 2002).

[189] *See* 678 F.3d at 179, 181.

[190] *See* 305 F.3d at 1064.

in fact, the Supreme Court remanded for that determination and (2) relied on pre-*Oncale* lower-court authority discounting the importance of motive, in contravention of *Oncale*.[191]

The dissent's theory, which essentially imposes strict liability for any gender-specific comment, would lead to absurd results. Any mention of a gender-specific body part in the workplace would be off limits. So a female employee could not discuss breastfeeding struggles with a co-worker. Workplace breast cancer awareness campaigns would likely end, because how could the word "breast" be avoided? Some workplaces, such as a doctor's office, could hardly function under such a rule. And since the dissent's standard includes buttocks as gender-specific body parts, though everyone has them, even *Oncale*'s example of a football coach smacking players' behinds would be barred.[192] The dissent would prohibit any conversation or conduct that "would not have occurred" to a person of another gender, including such innocuous topics as a pregnant worker's due date or asking to borrow a feminine hygiene product. It defies common sense to think this is what the Legislature had in mind when enacting the TCHRA, and it serves no one's interests to impose such preposterous requirements in the workplace. The dissent agrees that "the TCHRA does not impose 'strict liability' for gender-specific comments," but that is the direct, logical result of the dissent's analysis. According to the dissent, the TCHRA limits liability to comments that are uninvited or unwelcome, so that not "every comment focused on gender-specific anatomy can constitute harassment."[193] And yet, that limitation is at odds with the

---

[191] *See id.* at 1066-67 (relying on *Doe v. City of Belleville*, 119 F.3d 563, 577-78 (7th Cir. 1997), *cert. granted, vacated, & remanded*, 523 U.S. 1001 (1998) (vacated and remanded for reconsideration in light of *Oncale*)); *id.* at 1073-74 & n.2 (Hug, J., dissenting).

[192] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

[193] *Post* at 29.

rest of the dissent's analysis, which condemns any gender-specific comment without regard to motive or context.

### 4. Horseplay

The dissent claims the Court is suggesting "Monterrubio's conduct was merely 'sexual horseplay,' and not sexual harassment."[194]  We characterize as horseplay the single incident of grabbing Clark's bottom during the Christmas photo, not all of Monterrubio's conduct.  Many courts analyzing same-sex harassment cases have found similar—and in some cases much more severe—conduct to be "horseplay."[195]  Contrary to the dissent's implication, these cases do not hold that the horseplay analysis is relevant only to determining whether harassing conduct is sufficiently severe or pervasive and irrelevant to whether the conduct is based on sex.[196]  Rather, these cases all specifically reject the plaintiff's claim on the because-of-sex element.  Of course, a claim involving alleged horseplay could fail on any sexual-harassment element, including the severe-or-pervasive requirement, but to exclude the gender-motivation element from all horseplay cases, as the dissent's analysis would do, misinterprets the law and is flatly inconsistent with *Oncale*.  It is also noteworthy that the dissent does not explain how the few incidents of conduct the dissent relies on would meet the severe-or-pervasive test, as is required to state a valid claim for sexual harassment.

---

[194] *Post* at 20 n.5.

[195] *See Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 562 (7th Cir. 2016); *King v. Super Serv., Inc.*, 68 F. App'x 659, 660, 664 (6th Cir. 2003); *Collins v. TRL, Inc.*, 263 F. Supp. 2d 913, 920 (M.D. Penn. 2003); *English v. Pohanka of Chantilly, Inc.*, 190 F. Supp. 2d 833, 846 (E.D. Va. 2002).

[196] *Post* at 20 n.5.

The dissent attempts to convert this horseplay incident into evidence of sexual desire by focusing on unconnected circumstances.[197] Yes, the coaches worked in a "middle-school educational environment," but how does that transform a brief bottom grabbing by a same-sex co-worker at an off-site faculty Christmas party into a sexual act? Monterrubio teased Clark about her sexual naiveté, but how is that gender-related? Men can be sexually naïve too. How does Monterrubio brushing Clark's shoulders in a doorway and bumping her with a box indicate the Christmas photo prank showed sexual desire? The dissent is at least making a limited effort to consider context, but it still fails to consider all the context, and the inferences it attempts to draw from incomplete context are illogical.

### 5. Comparison of Treatment of Male and Female Employees

Monterrubio was rude, crass, and hostile towards seemingly everyone at work, male or female. The dissent misanalyzes the significance of this evidence. How she treats not just Clark but everyone else at work provides important context regarding Monterrubio's motives. The dissent suggests that federal courts reject this approach, but as we discussed earlier, that is an overly simplistic view of the authority.[198] Evidence that shows qualitative differences in a harasser's treatment of men and women can indeed support an inference of gender-based discrimination, as the dissent's cases point out. But if the harasser treats men and women the same, then the conduct is indiscriminate, not discriminatory.[199] *Oncale* specifically authorized a comparison of the treatment of men and women in a mixed-sex workplace, like the middle school

---

[197] *Post* at 24.

[198] *Post* at 28-29.

[199] *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301 (11th Cir. 2007); *see also Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 262 (4th Cir. 2001); *Jackson v. City of Killeen*, 654 F.2d 1181, 1186 (5th Cir. 1981).

here, as a method to prove same-sex harassment.[200]  That comparison here shows substantial, similar inappropriate behavior towards both men and women, giving rise to no inference of discrimination.[201]

### C.      Retaliation

The dissent's retaliation conclusions suffer from factual distortions and legal inaccuracies.

#### 1.  Distorted Facts

The dissent relies on its factual recitation and corresponding because-of-sex analysis to argue Clark's May 14 letter notified Principal Kershner that she was complaining of sex-based discrimination.  In addition to the factual flaws that carry over from the standard of review and sexual-harassment analyses, the dissent's retaliation discussion has unique factual concerns.

To determine whether the May 14 letter constitutes protected activity, the obvious focus is on the contents of the letter Clark gave Kershner, not the revised version she gave to the EEOC months later.  The dissent acknowledges the letters are not the same but characterizes the differences as "slight[]" and "immaterial to the overall analysis."[202]  We disagree.  As detailed above,[203] the versions contain several substantial variances, including most significantly for the dissent's analysis that the version Clark gave to Kershner did not claim that Monterrubio said she would think of Clark while having sex next to the candle.  Nor does either letter contain numerous details the dissent relies on in its carried-over sexual-harassment analysis, including the

---

[200] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998).

[201] *Supra* section II.B.4.

[202] *Post* at 32 n.12.

[203] *Supra* at 43.

bottom-grabbing and cupcake-licking incidents and the gossip that Monterrubio and Boyer might be lesbians. The dissent does not attempt to confront the impact of these differences.

### 2. Faulty Legal Analysis

Built on a foundation of poor factual analysis, the dissent's legal arguments are similarly faulty. Without the issue ever having been raised and with no input from the parties, the dissent would hold that the causation standard the parties have used—that the adverse action would not have occurred "but for" the protected activity—is correct for Title VII retaliation cases but incorrect for TCHRA retaliation cases. According to the dissent, causation is determined by considering whether the protected activity is a "motivating factor" in the employment decision. The dissent could be right that this standard should apply, but when parties have not raised an issue, we should not reach out unnecessarily to decide an issue on our own accord. And we definitely should not do so if, as the dissent implies, the result would be the same either way.[204]

In analyzing whether the May 14 letter is protected activity, the dissent says the merits of the underlying discrimination claim are irrelevant in a retaliation claim.[205] We agree that merits are not the issue, which is why we conduct a retaliation analysis even after rejecting Clark's harassment claim. The issue is not, as the dissent would have it, only whether Clark believed her complaint was about gender discrimination but whether she communicated that belief to Principal Kershner.[206] Based on a reading of the entire, signed version of the letter presented to Kershner,

---

[204] *Post* at 36.

[205] *Post* at 34.

[206] *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 586 (Tex. 2017); *see also Brown v. United Parcel Serv.*, 406 F. App'x 837, 840 (5th Cir. 2010); *Harris-Childs v. Medco Health Sols., Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006).

reasonable jurors could not conclude Clark was complaining that Monterrubio mistreated her because of her gender, which she never stated, as opposed to the many other reasons she did state.

Having concluded Clark's May 14 letter, in addition to her EEOC charge, were protected activities, the dissent undertakes a causation analysis that is incorrect even if the May 14 letter were protected activity. The dissent does not challenge our analysis that two other complaints before May 14 were not protected activity, yet it relies on one such complaint from March in pointing out that Clark's performance evaluations were favorable until she made that complaint.[207] If the March complaint is not protected activity, a simultaneous negative evaluation cannot, by definition, be retaliation.

## IV. Conclusion

The purported harassment alleged in this case is repugnant and unacceptable in a civilized society. But we cannot step beyond the words of the statute or circumscribe the legal-sufficiency standard to vindicate a moral wrong merely because it is appalling. Neither the anti-discrimination laws nor the legal-sufficiency standard permit us to consider evidence apart from its context. This aspect of our de novo review jurisdiction is no novelty. We do not construe statutory language in isolation because context informs intent. We do not review defamatory statements in isolation because context informs meaning. In many different scenarios, we have acknowledged that, with respect to legal sufficiency, context is vital because the absence of evidence may not appear until the evidence is reviewed in context.[208]

---

[207] *Post* at 37.

[208] *See City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005).

Adhering to elementary legal-sufficiency principles, we conclude the record bears no evidence from which a factfinder could reasonably infer Clark was subjected to discrimination because she is a woman. On the more novel legal issue presented, we hold that, once Alamo Heights produced evidence rebutting the presumption of retaliation, Clark was required to present at least some evidence that Alamo Heights's stated reasons for terminating her employment were mere pretext for retaliatory intent.

We thus hold that governmental immunity has not been waived, and subject-matter jurisdiction is lacking, because (1) Clark has not raised a fact issue that the alleged harassment was motivated by her gender, (2) all elements of a TCHRA circumstantial-evidence case are jurisdictional facts, not just the prima-facie-case element, and (3) the record bears no evidence that Clark was placed on a growth plan or terminated for engaging in a protected activity. We reverse the court of appeals' judgment and dismiss Clark's claims.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED:  April 6, 2018**