**Affirmed and Memorandum Opinion filed January 14, 2021.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-19-00422-CV

---

## METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, TEXAS, Appellant

## V.

## JOHN CARTER, Appellee

---

**On Appeal from the 190th District Court
Harris County, Texas
Trial Court Cause No. 2017-08386**

---

### MEMORANDUM OPINION

Appellant Metropolitan Transit Authority of Harris County (Metro) appeals from the trial court's order denying its plea to the jurisdiction seeking dismissal of appellee John Carter's discrimination and retaliation causes of action brought pursuant to the Texas Commission on Human Rights Act (TCHRA). *See* Tex. Lab. Code §§ 21.051; 21.055. We affirm the trial court's order.

BACKGROUND

Carter worked as a bus operator for Metro beginning in 1996. Carter had suffered with polio as a child and this left him with a noticeable limp in his right leg. The leg issue had never interfered with his ability to perform his duties as a Metro bus operator. Starting in 2012, bus operators such as Carter were required to maintain a Commercial Driver's License (CDL) as well as a valid Department of Transportation Medical Certification Card. It is undisputed that Carter possessed a valid CDL and a valid Department of Transportation Medical Certification Card signed by a doctor on the Department of Transportation national registry of doctors approved to conduct the certification medical examinations during all relevant times.

In 2014, Carter's bus was involved in an accident. The subsequent investigation determined that a car had turned left in front of Carter's bus and the two vehicles collided. Nonetheless, Metro labeled the accident "preventable." This designation potentially subjected Carter to disciplinary action by Metro.

After Metro had classified the accident as preventable, Carter's union contacted Bobby Ramirez, the superintendent of the Metro facility where Carter was stationed, to ask him to review the on-board video[1] of the accident so that he might reconsider Metro's classification of the accident. Based on this request, Ramirez reviewed the accident video. According to Ramirez, while watching the video he thought he saw that Carter did not have sufficient leg strength to lift his leg off the accelerator and instead had to use his arm to move his leg off the accelerator and onto the brakes.[2] After viewing the video, Ramirez asked Metro's

---

[1] Metro's buses are equipped with video cameras that show both the driver and the front of the bus. The video does not appear in the appellate record. The record indicates that it was submitted to the trial judge only for in camera review.

[2] During his deposition, Carter denied that he had to use his arm to move his leg onto the

wellness department to order Carter to submit to a fitness-for-duty medical physical. Ramirez made this request even though he did not know the guidelines for when Metro supervisors could ask an employee to submit to a fitness-for-duty medical examination. Ramirez also placed Carter on modified duty after the accident. According to Ramirez, this status allowed Carter to maintain his wages and Metro employee benefits even though he was not operating a bus.

Carter submitted to the fitness-for-duty examination at Concentra Medical Center. Dr. Melincoff performed the examination and determined that Carter was fit for duty. Ramirez, however, was not satisfied with the outcome of Carter's medical examination. Despite Dr. Melincoff releasing Carter back to work, Ramirez refused to put Carter back to work driving a bus. According to Ramirez, he refused to put Carter back driving a bus because he was not certain that Carter had actually undergone a fitness-for-duty medical examination. Ramirez asked the wellness department to send Carter back to Concentra for another fitness-for-duty examination and to make certain that the doctors there knew Carter had been involved in a bus accident and that Carter "has issues with [his] right leg," and that Ramirez wanted the doctors to confirm that before releasing Carter back to work.

After receiving the directive from Ramirez, a second Concentra doctor, Viet Nguyen, re-examined Carter, reversed Dr. Melincoff's opinion from the previous week, "temporarily deferred" Carter's certification, and recommended that Carter must pass a Texas Department of Public Safety Skilled Performance Evaluation (SPE) to determine if he was capable of driving commercial vehicles. There is no evidence in the record that either Metro or Carter considered Dr. Nguyen's initial examination of Carter to be a formal Department of Transportation certification examination because Dr. Nguyen did not report his findings to the Federal Motor

brake pedal.

3

Carrier Safety Administration. *See* 49 C. F. R. 391.43(g)(5) (requiring doctors to report results of medical certification examinations to the FMCSA).

Dr. Nguyen examined Carter again two months later, in August 2014. This time Dr. Nguyen issued Carter a three-month medical certification but stated Carter must be periodically monitored due to possible obstructive sleep apnea. Dr. Nguyen issued the temporary medical certification so Carter could undergo a sleep study during that three-month-time period. Dr. Nguyen also checked the box for an SPE Certificate. Dr. Nguyen later prepared an affidavit attached as an exhibit to Metro's plea to the jurisdiction. Dr. Nguyen averred that following Carter's examination, he "required Mr. Carter to obtain a Skill Performance Evaluation (SPE) Certificate before he could operate a commercial motor vehicle."

According to Ramirez, DPS issues SPE's and it is completely within DPS's discretion whether to issue an SPE or not. Ramirez had never before participated in sending a Metro bus operator to DPS for an SPE. While Ramirez testified that Metro assisted Carter with the SPE process, he could not explain what, if anything, Metro specifically did to assist Carter. Ramirez also did not know if Metro's efforts to assist Carter with the SPE process included having someone from the Metro training department, or any other Metro personnel, get on a bus with Carter to evaluate his ability to drive a bus. Ramirez did reveal that it was during the SPE process that the limb-waiver requirement was imposed on Carter.[3] Ramirez believed the requirement of a limb waiver was generated as part of the DPS process for getting an SPE test done. According to Ramirez, Carter was the first Metro bus operator he was aware of who had the limb-waiver requirement imposed

---

[3] The record reveals very little evidence explaining exactly what a "limb waiver" is, who or what department issues it, who or what department or entity imposed the requirement on Carter, and who exactly must possess one before being allowed to obtain a CDL. Carter alleged in his petition that a limb waiver must be obtained by a person with "documented limb amputations or impairments as evaluated by board-certified orthopedic surgeons or physiatrists."

4

on him.  Finally, Ramirez testified that he was not aware whether Carter ever took the SPE test or obtained an SPE certificate.  At this point, Carter was now required to (1) undergo a sleep study,[4] (2) obtain a limb waiver, and (3) obtain an SPE certificate before Metro would allow him to return to operating a bus.

Carter's two-year DOT medical certificate was set to expire in May 2015.  Carter went to a doctor registered with the national registry to perform Department of Transportation physicals as Metro required him to do.[5]  The doctor performed a physical on Carter, which he passed.  The doctor then renewed Carter's medical certification which would now expire two years later in May 2017.  The examining doctor was on the national registry of approved doctors as was required by Metro.[6]

Metro did not accept Carter's 2015 medical certificate.  Metro asserted that the 2015 medical certificate conflicted with Dr. Nguyen's August 2014 report.  Metro notified Carter that he would be required to undergo another physical examination, this time by a doctor chosen by Metro.  Carter agreed to the examination.  However, just prior to the appointment, Carter experienced a flare up of gout, which he discussed with the examining doctor at the appointment.  As a result of the gout flare-up, Carter was unable to complete the medical examination as scheduled.  The appointment was rescheduled in January 2016 and the doctor who performed the examination refused to clear Carter for medical certification due to perceived impairment of Carter's right leg.

---

[4] Carter did undergo a sleep study and he was diagnosed with sleep apnea.  Carter was prescribed, and he later obtained, a CPAP machine to address his sleep apnea.

[5] Carter's 2013 medical certification examination was also performed by a doctor on the national registry.

[6] In Metro's letter informing Carter that he was required to undergo a third medical certification examination, Metro recognized that the examination could be performed by "an approved clinic or individual listed on the National Registry."  Despite that recognition, and the fact that Carter would be paying the cost of the examination, Metro scheduled the examination at a doctor it chose.

From June 2014 to January 2016, Metro moved Carter from place to place within the agency. First, Metro placed Carter in driver retraining. Metro then assigned Carter to a desk in Metro's downtown building where he opened letters, pulled staples, and placed the letters in a stack. When Metro did not accept Carter's May 2015 medical certification, Carter hired an attorney and complained that Metro's treatment discriminated against him. Soon thereafter Metro assigned Carter to a new shift that required him to report to a remote outdoor park and ride facility before dawn each morning. Metro asked Carter to count transit passengers passing through the station. There was no building or shelter other than the transit platform, so Carter had to spend the summer days sitting in his car. In the fall, Metro moved Carter to the North Shepherd Park and Ride facility. According to Carter, the facility initially had a small information booth equipped with light and heat. But, in November, Metro first cut off the electricity to the booth, and then removed the booth altogether, leaving Carter without light, heat, or shelter for his early morning shifts. After he was terminated, Carter travelled to the North Shepherd facility and he discovered that Metro had returned a booth to the facility. Metro kept Carter in this assignment from June 2015 through January 2016.

In January 2016, after receiving notification that Carter had not passed the January 2016 medical examination, Metro placed Carter on involuntary medical leave. Prior to this point, Carter had been able to maintain his wages and Metro employee benefits. The notification letter informed Carter that once he had received a "release with no restrictions" from his doctor, he should contact Metro to return to work. The letter also notified Carter that he must make arrangements with Metro to pay his medical insurance premiums and that a failure to contact the appropriate Metro department "can result in termination of medical coverage." Faced with this letter, Carter was unsure how to proceed. Carter possessed a May

6

2015 medical certification stating he was able to drive commercial vehicles without restrictions, but Metro refused to accept this certificate. DPS had rejected his efforts to obtain an SPE. Carter's effort to obtain a limb waiver was denied by DPS. Metro then assigned an employee to assist Carter with the application, but Metro failed to properly prepare the new limb-waiver forms, so Carter never obtained a limb waiver. In addition, Metro had shown no interest in giving Carter an opportunity to demonstrate that he was physically capable of performing the job of bus operator by putting him on a bus along with a supervisor such as Ramirez, or a Metro trainer. At this point, Carter filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Texas Workforce Commission (TWC) on April 18, 2016.

In March 2017, Metro "administratively terminated" Carter. None of the Metro personnel who provided deposition or affidavit testimony in this case took responsibility for that decision, nor could they identify the responsible Metro official. In the notification letter, Metro stated that "[d]ue to the medical restrictions prohibiting you from performing the essential duties of a Bus Operator, the Authority must administratively separate you as an employee." In the letter, Metro did not identify any specific medical restrictions nor any essential job functions that Carter could not perform. Instead, Metro informed Carter that he "must be qualified to perform the prospective job requirements and be physically capable of performing the essential functions for an extended period of time." Finally, the letter notified Carter that his employment benefits ceased once he was "administratively terminated."

Carter eventually found work as a commercial truck driver with a trucking company. This job requires Carter to possess both a CDL and a DOT medical certification. At the time of his deposition, Carter possessed both and was still

7

employed as a driver by the trucking company.

Carter filed suit against Metro in February 2017 alleging causes of action for disability and age discrimination as well as a retaliation cause of action. Metro filed a plea to jurisdiction and an amended plea to the jurisdiction arguing that the trial court lacked jurisdiction because Carter had failed to demonstrate that Metro's governmental immunity had been waived. At the oral hearing on Metro's plea, Carter non-suited his age discrimination claim in open court. After the oral hearing concluded, the trial court denied Metro's plea. This interlocutory appeal followed.

## ANALYSIS

Metro raises three issues on appeal. In its first issue, Metro argues Carter's disability discrimination and retaliation claims are time-barred. In its second issue Metro asserts that Carter did not present prima facie evidence of the second element of his disability cause of action. Finally, in its third issue, Metro contends Carter failed to present prima facie evidence of the third element of his retaliation claim. We address these issues in order.

## I.     Standard of review for pleas to the jurisdiction

As a governmental unit, Metro is immune from suit absent an express waiver of governmental immunity. *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018) (stating governmental units are immune from suit unless the state consents). The TCHRA provides a limited waiver of that immunity when a governmental unit has discriminated in any manner against an employee on the basis of race, gender, disability, or other protected classification, or has retaliated against the employee for opposing or complaining of such discrimination. *Harris Cty. Hosp. Dist. v. Parker*, 484 S.W.3d 182, 191 (Tex.

8

App.—Houston [14th Dist.] 2015, no pet.). The TCHRA's immunity waiver applies only if the plaintiff alleges a violation within the scope of the statute. *Clark*, 544 S.W.3d at 770; *Parker*, 484 S.W.3d at 191. If the plaintiff does not sufficiently plead facts that state a claim under the TCHRA, the governmental unit may challenge the pleadings with a plea to the jurisdiction. *Parker*, 484 S.W.3d at 191. The governmental unit may also use a plea to the jurisdiction to challenge the existence of jurisdictional facts. *Id*.

Immunity from suit may be asserted through a plea to the jurisdiction or other procedural vehicle, such as a motion for summary judgment. *Clark*, 544 S.W.3d at 770. A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both. *Id.* When a jurisdictional plea challenges the pleadings, we determine if the plaintiff has alleged facts affirmatively demonstrating subject-matter jurisdiction. *Id.* If, however, the plea challenges the existence of jurisdictional facts, we move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim. *Id.*

Here, Metro's plea challenged the existence of jurisdictional facts with supporting evidence. In that situation, the standard mirrors that of a traditional summary judgment. *Id.* at 771. If the plaintiff's factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal, the plaintiff must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction. *Id.* When the evidence submitted to support the plea implicates the merits of the case, we take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Id.* In doing so, however, we cannot disregard evidence necessary to show context, and we cannot

disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not. *Id.*

We review a trial court's disposition of a jurisdictional plea de novo. *Suarez v. City of Texas City*, 465 S.W.3d 623, 632 (Tex. 2015).

## II.  Carter's claims are not time-barred.

Carter alleges that Metro discriminated against him on the basis of disability or perceived disability when it placed him on unpaid medical leave and then subsequently terminated him.  Carter also alleges that Metro retaliated against him after he retained legal counsel to oppose those same discriminatory actions.  Metro argues in its first issue that Carter's claims are time-barred because he waited too long to file his administrative complaint with the TWC and the EEOC.  According to Metro, Carter's administrative filings came too late because Carter was on notice as early as August 6, 2014, the day Dr. Nguyen imposed the SPE requirement on him, that he was the victim of disability discrimination.  Metro asserts that Carter was therefore required to file his charge of discrimination within 180 days of that date.  Because he did not, Metro argues Carter's claims are time-barred.  We disagree.

In addition to the date Dr. Nguyen imposed the SPE requirement, the record evidence establishes that Carter (1) retained legal counsel in May 2015 to complain about Metro's treatment of him; (2) was placed on involuntary medical leave of absence on January 13, 2016, and (3) was subsequently terminated on March 27, 2017.  The parties do not dispute that Carter filed his charge of discrimination on April 18, 2016 and the record establishes that Carter filed suit against Metro on February 6, 2017.

A lawsuit under the TCHRA is limited to the claims made in the charge or

10

complaint filed with TWC and factually related claims that can reasonably be expected to grow out of the TWC's investigation. *Alief Indep. Sch. Dist. v. Brantley*, 558 S.W.3d 747, 756 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). The legislature has mandated that all statutory prerequisites to suit are jurisdictional requirements in suits against governmental entities. *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 510 (Tex. 2012); *Metro. Transit Auth. of Harris Cty. v. Douglas*, 544 S.W.3d 486, 492 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). The TCHRA requires a person claiming to be aggrieved by an unlawful employment practice to file a charge with the TWC or the EEOC within 180 days of the allegedly unlawful employment practice. Tex. Lab. Code § 21.201(a), (g). Thus, filing a timely charge with the TWC or the EEOC is generally a jurisdictional prerequisite to filing suit for unlawful employment practices against a governmental entity. *Chatha*, 381 S.W.3d at 511–12, 514; *see also Douglas*, 544 S.W.3d at 492. A plaintiff's lawsuit under the TCHRA will be limited in scope to only those claims that are included in a timely-filed administrative charge and to factually related claims that could reasonably be expected to grow out of the agency's investigation of the claims stated in the plaintiff's charge. *City of Sugar Land v. Kaplan*, 449 S.W.3d 577, 582 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Additionally, in *Douglas*, this court determined that a plaintiff such as appellee is not required to file a new Charge of Discrimination to allege discriminatory discharge or retaliation if those claims are factually related to claims that were previously included in a Charge of Discrimination. 544 S.W.3d at 498–99 (citing *Gupta v. E. Tex. State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981)).

In the present case, the evidence is undisputed that, while Carter was (1) placed on modified duty based on Dr. Nguyen's decision to impose the SPE

requirement, (2) transferred to a remote park and ride facility, and (3) subjected to additional medical examinations, he was still receiving his regular pay and benefits, which were not impacted until he was placed on involuntary medical leave. These types of actions by Metro, which did not impact his compensation and fall short of suspension or termination, were insufficient by themselves, to qualify as actionable employment actions. *See Chatha*, 381 S.W.3d at 510 (stating in a pay discrimination case, that the "employee must file a complaint under the TCHRA within 180 days of the date she is informed of the alleged discriminatory pay decision"); *Olivarez v. University of Texas at Austin*, No. 03-05-00781-CV, 2009 WL 1423929, *3 (Tex. App.—Austin May 21, 2009, no pet.) (mem. op.) (stating that adverse employment actions must be tangible or material and that demotions without change in pay, or reassignment to a more inconvenient job, are insufficient to constitute a tangible or material adverse employment action). The evidence establishes that Carter was placed on involuntary medical leave of absence on January 13, 2016. It was only when Metro placed Carter on involuntary medical leave even though he possessed a valid, two-year CDL and DOT medical certification, that Metro's discriminatory animus became sufficiently clear and he had suffered a tangible employment action, that Carter was required to file a charge of disability discrimination. *See id.* Carter filed his charge of discrimination on April 18, 2016, which is well within 180 days of that date. In addition, Carter did not hire an attorney to complain about Metro's treatment until May 2015, almost a full year after Dr. Nguyen imposed the SPE requirement. Thus, Dr. Nguyen's action could hardly serve as notice that Carter would be retaliated against for an action he had not yet taken. As with the disability discrimination complaint, we conclude that Carter was not on notice of Metro's retaliation against him until Metro placed him on involuntary medical leave.[7] To

---

[7] While Carter filed his charge of discrimination before he was terminated, we conclude

the extent Carter references the earlier actions Metro took against him, such as refusing to recognize his medical certifications and transferring him to an out of the way park and ride facility, we conclude that he may use those actions "as background evidence in support of a timely claim." *Esters v. Tex. Dept. of Transp.*, No. 14-11-00977-CV, 2013 WL 3947159, at *5 n.9 (Tex. App.—Houston [14th Dist.] July 30, 2013, pet. denied) (mem. op.) (internal quotation marks omitted). We overrule Metro's first issue arguing Carter's claims are time-barred.

## III. There is a fact issue on whether Carter was qualified for the job of bus operator.

Metro complains in its second issue that Carter did not establish a prima facie case of disability discrimination. To establish a prima facie case of disability discrimination, the plaintiff must show that (1) he has a disability, (2) he is qualified for the job, and (3) he suffered an adverse employment decision because of his disability. *Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 436 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). The only element at issue on appeal is whether Carter established a prima facie case that he was qualified for the job. To establish that he was qualified for the job, Carter was required to present evidence showing either (1) he could perform all the essential job functions of a Metro bus operator with or without modifications or accommodations, or (2) that some accommodations by Metro would enable him to perform the bus operator job functions. *Id.* at 437.

In support of its argument that Carter did not establish a prima facie case that he was qualified for the job, Metro points out the following: (1) Dr. Nguyen issued Carter a three-month medical certification that was only effective if Carter

---

that he was not required to file an additional charge of discrimination on that claim. *Douglas*, 544 S.W.3d at 499.

13

obtained an SPE, which Carter never obtained; (2) Ramirez's testimony that he was concerned about Carter's ability to safely perform his duties after he viewed the video of the accident involving Carter's bus and that he was authorized to send Carter for a fitness-for-duty medical examination based on that concern; and (3) Carter was required to obtain his medical certifications only from a "Metro-approved," "DOT-certified medical examiner." We conclude there is a genuine issue of material fact on each of these contentions. First, the evidence is disputed as to which doctors could perform the DOT medical certification examinations on Carter. While Metro witnesses asserted that the examining doctor had to be approved by Metro, they did not offer any evidence on what exactly that meant. The December 16, 2015 letter notifying Carter that he had to submit to an independent third-party medical examination states only that the examining doctor had to be working at "an approved clinic or [an] individual listed on the National Registry." The letter does not mention any other requirement. Second, there is evidence in the record that Carter maintained a CDL and a Department of Transportation medical certification at all relevant times. There is also evidence that Carter was working at the time of his deposition as a commercial truck driver, a job that required him to maintain a CDL and a Department of Transportation medical certification. This evidence creates a fact issue on whether Carter was qualified to perform the duties of a Metro bus operator. Since Metro has challenged on appeal only whether Carter established a prima facie case that he was qualified to perform the job of bus operator, we conclude that Metro has not demonstrated that the trial court erred when it denied Metro's plea. We therefore overrule Metro's second issue.

## III. There is at least a fact issue on Carter's retaliation cause of action.

We turn next to Carter's retaliation cause of action. Carter alleges that

14

Metro retaliated against him after he retained legal counsel in May 2015 who then made complaints to Metro on his behalf. Carter further alleges that Metro retaliated against him by first placing him on involuntary medical leave and then terminating his employment altogether. Metro argues in its third issue that the trial court erred when it denied its plea aimed at Carter's retaliation claim because Carter did not present evidence establishing a prima facie case on the causation element of his retaliation claim.

The TCHRA makes retaliation for opposing a discriminatory practice actionable. *See* Tex. Lab. Code § 21.055. "To establish a prima facie case of retaliation, an employee must show: (1) she engaged in an activity protected by the TCHRA, (2) she experienced a material adverse employment action, and (3) a causal link exists between the protected activity and the adverse action." *Clark*, 544 S.W.3d at 782. Metro challenges only Carter's prima facie evidence of the third element.

Here, Metro cites a small portion of Carter's deposition testimony:

Q.          Are there any other ways that you feel that you were being treated differently by METRO after you retained an attorney?

Carter:     Yes.

Q.          Please identify what those are.

Carter:     I feel that after I retained an attorney they kept doing the same things. They kept trying to do the same things with no avail. It just – everything failed for them.

Q.          So it was exactly the same treatment that you were receiving prior to re-hiring an attorney; is that correct sir?

Carter:     Somewhat.

Based on this exchange, Metro argues that Carter "acknowledged that there was no change in treatment from before and after his purported 'protected activity' of

retaining an attorney." Carter's vague answer hardly constitutes an acknowledgement that his treatment did not change after he retained an attorney. In addition, Metro ignores the evidence in the record that Metro suspended and then fired Carter after he retained counsel. In both notification letters, Metro informed Carter that the reason for Metro's action was Metro's belief that "medical restrictions [were] prohibiting [him] from performing the essential duties of a Bus Operator." It was this belief by Metro, which Metro held despite Carter possessing a valid CDL and a Department of Transportation medical certification, that Carter retained his attorney to address. We conclude that Carter presented sufficient evidence to create a fact issue on his retaliation case.[8] We overrule Metro's third issue.

## CONCLUSION

Having overruled Metro's issues on appeal, we affirm the trial court's order denying Metro's plea to the jurisdiction and remand the case to the trial court for further proceedings consistent with this opinion.

/s/     Jerry Zimmerer
Justice

Panel consists of Chief Justice Christopher, and Justices Wise, and Zimmerer.

---

[8] We also reject Metro's nebulous argument that Carter did not establish a prima facie case that he experienced an adverse employment action because his "administrative separation" was not a discrete decision made by Metro but was instead merely the bureaucratic fruition of a decision made long before by Dr. Nguyen, who was not even a Metro employee. Metro cites no legal authority for this novel argument and we conclude it is waived for inadequate briefing. *See* Tex. R. App. P. 38.1(i).